Filed 9/29/16 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br> Plaintiff and Respondent,<br>v.<br>BRADLEY BLACKWELL,<br> Defendant and Appellant. | A144424<br><br>(Sonoma County<br>Super. Ct. No. SCR-511523)<br><br>**ORDER MODIFYING OPINION<br>AND DENYING REHEARING<br>[NO CHANGE IN JUDGMENT]** |

**THE COURT:**[*]

IT IS ORDERED that the opinion filed on September 7, 2016, is modified as follows and the petition for rehearing is DENIED:

1. On page 1, the first sentence of the first paragraph is deleted and replaced with two sentences that now read:

    In 2007, Bradley Blackwell, then 17 years old, committed a burglary and attempted robbery with an accomplice. Uriel Carreno was shot and killed in the course of those offenses.

2. On page 21, footnote 10 is modified so that it now reads:

    By accepting Blackwell's analogy to the death penalty, we do not mean to suggest that death is not " 'qualitatively different from all other punishments.' " (*People v. Jones* (2012) 54 Cal.4th 1, 81.) We reject Blackwell's unsupported attempt to import wholesale the high court's adult death penalty jurisprudence. There is no authority to support Blackwell's additional assertion that the holding of *Godfrey v. Georgia* (1980) 446 U.S. 420 "must apply in juvenile life without parole cases." In any event, the California Supreme Court "has consistently rejected the claim that the statutory special circumstances, including the felony-murder special circumstance, do

---

[*] Before Jones, P.J., Simons, J., and Bruiniers, J.

not adequately narrow the class of persons subject to the death penalty." (*People v. Pollock* (2004) 32 Cal.4th 1153, 1195.)

The modification effects no change in the judgment.

Date_____                    _____ Acting
P.J.

Superior Court of Sonoma County, No. SCR-511523, Rene A. Chouteau, Judge.

L. Richard Braucher, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Jeffrey M. Laurence, Assistant Attorney General, Joshua A. Klein, Deputy Solicitor General, Laurence K. Sullivan and Seth K. Schalit, Deputy Attorneys General, for Plaintiff and Respondent.

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>BRADLEY BLACKWELL,<br><br>        Defendant and Appellant. | A144424<br><br>(Sonoma County<br>Super. Ct. No. SCR-511523) |

In 2007, Bradley Blackwell, then 17 years old, committed a burglary and attempted robbery with an accomplice and shot and killed Uriel Carreno in the course of those offenses. Although Blackwell was a minor at the time he committed these offenses, the district attorney elected to directly file the case in adult court under the provisions of Welfare and Institutions Code section 707, subdivision (d). Blackwell was convicted in 2009 of first degree murder with a robbery-murder special circumstance (Pen. Code, §§ 187, subd. (a), 189, 190.2, subd. (a)(17)(A)) and sentenced to life without the possibility of parole (LWOP).[1]

In a prior appeal (*People v. Blackwell* (June 20, 2013, A128197) [nonpub. opn.]), we reversed Blackwell's sentence and remanded for resentencing pursuant to the constitutional standards announced in *Miller v. Alabama* (2012) 567 U.S. ___, ___ [132 S.Ct. 2455, 2464, 2468–2469] (*Miller*) [mandatory LWOP sentences for homicide amount to cruel and unusual punishment under the Eighth Amendment when imposed on

---

[1] Undesignated statutory references are to the Penal Code.

1

defendant who was a juvenile at time of offense].[2] On remand, the trial court considered the factors outlined in *Miller*, and again imposed an LWOP sentence. Blackwell again appeals, arguing that the sentence amounts to cruel and unusual punishment, violates the Sixth Amendment, and constitutes an abuse of discretion. We affirm.

## I.    FACTUAL AND PROCEDURAL BACKGROUND[3]

Uriel Carreno was living in the converted garage of his aunt and uncle's home on Joan Drive in Petaluma. On February 7, 2007, he ate lunch with his aunt and returned to his garage apartment. A friend of Carreno's came by later that afternoon and found him lying on the floor, not moving. Carreno had been shot four times in his side and once in his back and had died of his wounds. A piece of the wood doorjamb was found across the room and a muddy shoeprint was on the door adjacent to the doorknob.

The police found five nine-millimeter shell casings of two different colors within three to five feet of Carreno's body. Forensic testing and the position of the casings revealed they were all fired from the same weapon while the shooter was inside the room. The coroner recovered five spent bullets from Carreno's body, all of which were fired from the same weapon. Two of the bullets had silver jackets (Silvertips) and the other three were of the Black Talon variety. There was no evidence that another firearm was discharged inside the room during the incident leading to Carreno's death.

---

[2] In appeal No. A128197, Blackwell challenged his sentence and we originally affirmed. His petition for review was denied by the California Supreme Court (Mar. 14, 2012, S199767), but the United States Supreme Court granted his petition for writ of certiorari, vacated the judgment, and remanded the case to this court for reconsideration in light of *Miller, supra,* 132 S.Ct. 2455, which was decided after issuance of our original opinion. After reconsideration in light of *Miller*, we remanded the case for resentencing. (*People v. Blackwell, supra,* A128197.) Our Supreme Court granted review of *Blackwell*, deferred briefing, and dismissed review (July 9, 2014, S212074) after it decided *People v. Gutierrez* (2014) 58 Cal.4th 1354 (*Gutierrez*).

[3] By separate order, we granted Blackwell's request for judicial notice of the record in his prior appeal. Our statement of facts is taken largely from *People v. Blackwell, supra,* A128197.

2

Jeffrey Gray, a convicted felon, saw Blackwell with a nine-millimeter Beretta during early 2007. Gray saw Blackwell load it with different colored bullets, and Blackwell told Gray that some of them were solid points and some were hollow points. Blackwell referred to the hollow point bullets as Black Talons.

On the afternoon Carreno was shot, Blackwell called Christopher Ortele and asked for a ride to Petaluma near the Kmart so he could pay his cell phone bill. Ortele was in the process of installing a car stereo for his friend Amber Powell, who agreed to drive. Powell and Ortele picked up Blackwell, who was with Keith Kellum, and they all drove from Rohnert Park to the Petaluma Kmart, but when Powell was about to turn into the parking lot, either Blackwell or Kellum told her to go the other way and directed her to a residential neighborhood near the corner of Novak and Joan Drive (the street on which Carreno lived).

After Powell parked the car, Blackwell and Kellum got out and walked in the direction of Joan Drive, telling Powell to wait for them. When they returned five to 15 minutes later, their demeanor had changed. They got into the car and were very quiet during the ride back. It appeared to Powell that Blackwell was "tearing up" and Kellum was consoling him.

Gray received a call from Blackwell that same afternoon and arranged to meet him at a trailer park where Gray was visiting a friend. Blackwell, Kellum, and Blackwell's brother, Colby, arrived in Colby's truck, and Gray got into the truck with them. Blackwell handed Gray some solvent and a rag and told him he wanted him to go inside a house or garage and wipe down any fingerprints that might be on the door. They pulled up to a house on Joan Drive, but saw fire trucks, police cars, and an ambulance outside. Blackwell appeared upset and explained he shot a "guy" they were trying to rob.

The group drove back to Blackwell's house, where Blackwell told Gray what happened in greater detail. Blackwell said he and Kellum went to Petaluma to rob a guy of some money and dope (crystal methamphetamine) and Kellum kicked in the door of the garage. Blackwell claimed that when he went into the garage, the guy inside took a shot at him, so he shot back several times.

3

Also on the day of the shooting, Blackwell called his girlfriend, Jacqueline Pollard, and asked her to come to his house. He sounded very anxious on the phone. When Pollard arrived she found Blackwell and Kellum stripped to their boxer shorts. Blackwell took her into the bathroom and told her in a "frantic" manner he had got a ride to Petaluma with some girl he did not know and had shot someone dead. Blackwell told Pollard he and Kellum had gone to a house, touched a doorknob, and kicked another door down, and he was afraid fingerprints and a footprint would be on two separate doors. He claimed that when they entered the room the person inside had been laying in bed and fired a shot between his head and Kellum's, so Blackwell fired a few shots into his chest. After the victim fell to the ground, Blackwell shot him a few more times. Blackwell admitted to Pollard he used his own gun, a semiautomatic Pollard had seen before. He told Pollard he and Kellum were going to burn their clothes, and mentioned a pair of shoes and a jacket that would be placed in a backpack along with the gun and some extra bullets. Pollard saw a backpack containing loose bullets and shoes in Blackwell's bedroom. Blackwell wiped off a gun, wrapped it in a T-shirt, and placed it in the backpack, which Blackwell said he was going to bury.

Sometime later, Blackwell told Pollard he was concerned too many people knew the gun was in the bag and where it was buried. He drove her into the Santa Rosa hills and asked her whether he should move it. She told him it might not be a good idea because they had been stopped by the police a number of times in the car they were driving.

On a visit to Bryan Fishtrom's house in March or April 2007, Blackwell was carrying a dirty bandana that contained a rusty semiautomatic handgun, bullets, and a lot of mud. The bullets were different colors and some had hollow tips.

In March 2007, Gray was picked up on a parole violation and told the police what he knew about Blackwell's involvement in Carreno's murder. In April 2007, after he was released, Gray saw Blackwell and his brother, Gary, at Fishtrom's house. Blackwell and his brother asked Gray how he had gotten out of jail, and Blackwell suggested that they go for a ride together. Gray declined.

4

In May 2007, Blackwell's brother, Colby, directed police officers to a 50-gallon drum in a rural area. Colby moved the drum, revealing a hole in the ground that contained wet clothing, shoes, pieces of a rifle-cleaning kit, five rounds of nine-millimeter ammunition, and rifle grease. A T-shirt had rust stains and bore the imprint of a gun consistent with a Beretta nine-millimeter handgun.

Blackwell was interviewed by the police and initially denied knowing anything about Carreno's murder. Later, he said he and Kellum went to a house to "burn a guy for drugs," and Kellum kicked open the door and shot the person inside several times. Blackwell told officers he knew Kellum had a handgun before they went, his brother Colby buried some of the evidence, and he (Blackwell) sold the gun Kellum used in Santa Rosa.

Blackwell and Kellum were charged with first degree murder with felony-murder special circumstances (murder in the commission of an attempted robbery and a burglary or attempted burglary), burglary of an inhabited dwelling house, and attempted robbery in an inhabited dwelling house.[4] The information further alleged Blackwell personally used and intentionally discharged a firearm. (§§ 187, subd. (a), 190.2, subd. (a)(17)(A) & (G), 211, 459, 664, 1203.06, subd. (a)(1), 12022.5, subd. (a), 12022.53, subds. (b)–(d).) Although Blackwell was 17 years old at the time of the killing, the district attorney elected to directly file the case in adult court pursuant to Welfare and Institutions Code section 707, subdivision (d).

Based on the foregoing evidence, a jury convicted Blackwell of first degree murder with felony-murder special circumstances (murder in the commission of an attempted robbery and a burglary or attempted burglary), burglary of an inhabited dwelling house, and attempted robbery of an inhabited dwelling house. The jury rejected allegations Blackwell had personally used and/or intentionally discharged a firearm in the commission of these offenses, causing death or great bodily injury.

---

[4] Kellum pleaded guilty to second degree murder before the jury was sworn.

After the jury returned its verdict, Blackwell's trial counsel filed a sentencing memorandum arguing that, under *Apprendi v. New Jersey* (2000) 530 U.S. 466, 490 (*Apprendi*), the court could not impose an "adult" sentence without a jury finding regarding Blackwell's age at the time of the offenses. The court rejected this argument and imposed an LWOP term on the murder count. The trial court acknowledged its discretion to impose a lesser term of 25 years to life because Blackwell was under 18 when he committed the murder (see § 190.5, subd. (b); hereafter section 190.5(b)),[5] but declined to exercise that discretion in light of Blackwell's juvenile court history and the "heinous" nature of the current offenses.

After remand in his prior appeal, Blackwell's counsel submitted a resentencing brief, arguing for a sentence of 25 years to life based on Blackwell's drug use, his purported lack of a violent criminal history, and the assertion that Blackwell was "not the shooter." The trial court also considered a supplemental presentencing report, in which the probation officer wrote: "[Blackwell] was approximately six months from the age of majority when the murder was committed. He was under the auspices of the Juvenile Court for approximately four years prior to the instant offense being committed, during which he spent a considerable amount of time away from his family while in placement and Juvenile Hall. We note his performance while a ward was completely unsatisfactory, and he was released from Juvenile Hall less than a month before the commission of the murder. While it is not definitively known who actually shot the victim, by at least one account [Blackwell] reportedly admitted he was the shooter and that Blackwell, [Kellum], and two other individuals attempted to go back to the scene of the murder to clean the area of fingerprints, but were dissuaded by the appearance of police and emergency personnel, who [had] already arrived. At no time during the trial . . . did it

---

[5] Section 190.5(b) provides, "The penalty for a defendant found guilty of murder in the first degree, in any case in which one or more special circumstances . . . has been found to be true . . . who was 16 years of age or older and under the age of 18 years at the time of the commission of the crime, shall be confinement in the state prison for [LWOP] or, at the discretion of the court, 25 years to life."

appear [Blackwell] was coerced or manipulated by [Kellum] during the commission of the crimes. In fact, it appears it was [Blackwell] who secured the ride over to the victim's residence on the day of the murder. [Blackwell's] juvenile history is replete with offenses, including stealing semi-automatic handguns from his parents, possessing a knife on his person, and attacking another juvenile hall resident. [¶] . . . This officer believes, as the *Miller* Court described, that [Blackwell] is a 'rare juvenile offender whose crime reflects irreparable corruption' and, given the totality of factors present, has rightfully earned a lifetime in custody."

Over defense objection, the trial court also considered Blackwell's records from the California Department of Corrections and Rehabilitation (CDCR). The CDCR records were summarized in an additional presentencing report.[6] "[T]here was little in-depth information regarding overall performance outside the scope of his mental/physical health issues. However, in an evaluation memo dated 02/26/14, records indicate [Blackwell], at the time, was facing a '115 disciplinary process' regarding an incident at Kern Valley State Prison for allegations of 'Conspiracy to Commit Murder.' It is unknown what the outcome of this 115 was. Nevertheless, the same memo outlined the fact [Blackwell] had 'been [previously] found guilty of 4 RVR's [(rules violation reports)] for Fighting, 1 RVR for Battery on an Inmate, and 1 RVR for Participation in a Riot.' It appears that over the years [Blackwell] was sent to the emergency room for treatment on at least two occasions for fighting or being assaulted. The 2014 memo noted his mental health was considered stable for the most part, with 'no indication of severe mental illness, danger to self, or grave disability' at the time of the assessment. . . . Notes further indicate by August 2014 [Blackwell] had distanced himself from the prison

---

[6] Although neither Blackwell's CDCR records, nor the probation department's supplemental presentencing reports initially appeared in the record before us, we have augmented the record to include the supplemental probation reports. There appears to be no dispute the probation report accurately summarizes the content of Blackwell's CDCR records.

gang '2-5ers.' We note that according to current custody information, [Blackwell] has several tattoos, including '187' in fangs on his chest."

On February 24, 2015, at the conclusion of a resentencing hearing, the trial court resentenced Blackwell to an LWOP term on the murder count. The trial court concluded "the sentence initially imposed was appropriate based on the factors existing at the time of the initial sentencing and is still the appropriate sentence after consideration of [Blackwell]'s performance as a prisoner at [CDCR]. The record before the court indicates that [Blackwell] is a 'rare juvenile offender whose crime reflects irreparable corruption' *Miller, supra*." The court explained:

"a. Age: [Blackwell] was 17 years and six months of age at the time of committing the murder. There is no evidence that [Blackwell] was particularly immature, impetuous, or failed to appreciate the risks and consequences of his act.

"b. Environmental vulnerabilities: There is no evidence of childhood abuse or neglect. Blackwell committed his first felony, theft of firearms, at the age of 13 and spent considerable periods outside the family home, in the custody of the Juvenile Court during the remainder of his childhood. There is no evidence that Blackwell's educational opportunities were limited, but the [CDCR] records indicate that he did not take full advantage of the opportunities that were offered to him. There is no evidence of susceptibility to psychological damage or emotional disturbance.

"c. Circumstances of the offense: The evidence indicates that Blackwell fully participated in the planning, execution and attempted cover-up of the crime, the brutal execution of the victim, who was lying in his own bed. There is no indication of familial or peer pressure. There is some evidence that Blackwell was using methamphetamine around the time of the crime, but no evidence of intoxication during the commission of the crime. *At trial, the jury verdict found not true the allegation that Blackwell used a gun. However, before trial, Blackwell admitted to his girlfriend . . . that he shot the victim with his 9 mm gun. At trial, Ms. Pollard testified credibly to this fact.*

"d. Possible lesser charges: The record contains no indication that a lesser offense should have been charged.

8

"e.  Possibility of rehabilitation:  The court has reviewed Blackwell's [CDCR] records to determine whether there is an indication of a possibility of rehabilitation. These records do not show any attempts by [Blackwell] to rehabilitate himself.  In fact, the records show a history of violent assaults involving [Blackwell], some of which he was not the primary aggressor, and some of which he was found to have initiated, including incidents in April of 2012 and July and December of 2013.  In January of 2014, [Blackwell] was found in possession of a razor which had been embedded in a toothbrush and which was possibly involved in a conspiracy to commit murder on another inmate. In addition, the records indicate that at some time during his incarceration he participated in a criminal prison gang, although he later attempted to separate himself from that gang. [Blackwell's] attorney argues strenuously that a lack of rehabilitation cannot be inferred from his prison records because as a life prisoner he is not afforded rehabilitative opportunities afforded to other prisoners.  While this may be true, the record does not indicate any effort by [Blackwell] to reject a life of violence."

The trial court also considered the following section 190.3 factors:[7]

---

[7] Section 190.3 provides in relevant part:  "If the defendant has been found guilty of murder in the first degree, and a special circumstance has been charged and found to be true . . . the trier of fact shall determine whether the penalty shall be death or [LWOP]. In the proceedings on the question of penalty, evidence may be presented by both the people and the defendant as to any matter relevant to aggravation, mitigation, and sentence including, but not limited to, the nature and circumstances of the present offense, any prior felony conviction or convictions whether or not such conviction or convictions involved a crime of violence, the presence or absence of other criminal activity by the defendant which involved the use or attempted use of force or violence or which involved the express or implied threat to use force or violence, and the defendant's character, background, history, mental condition and physical condition. [¶] . . . [¶] In determining the penalty, the trier of fact shall take into account any of the following factors if relevant: [¶] (a) The circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstances found to be true pursuant to Section 190.1. [¶] (b) The presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence. [¶] (c) The presence or absence of any prior felony conviction. [¶] (d) Whether or not the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance. [¶] (e)

"A. Circumstances of crime: This was a cold-blooded murder committed in the course of a residential burglary. The murder was planned by [Blackwell] and his accomplice. They also planned and attempted to execute a failed cleanup of the crime scene.

"B. Prior criminal activities, use of force: In 2002 Blackwell stole firearms. In 2004 Blackwell escaped from Hannah Boys Center and was found in possession of knives. In 2005 Blackwell threatened his girlfriend while in possession of a knife and instigated fights at his girlfriend's school. In 2006 Blackwell attacked a rival gang member in the Juvenile Hall.

"C. Felony convictions: Blackwell suffered juvenile adjudications based on theft of guns and possession of methamphetamine.

"D. Offense committed under influence of extreme emotional or mental disturbance: There is no evidence of either extreme emotional or mental disturbance.

"E. The victim participated in the homicide. The victim was in his own home lying on his bed at the time that he was brutally murdered.

"F. Reasonable belief in moral justification: There is no evidence that [Blackwell] believed in a moral justification for his acts.

---

Whether or not the victim was a participant in the defendant's homicidal conduct or consented to the homicidal act. [¶] (f) Whether or not the offense was committed under circumstances which the defendant reasonably believed to be a moral justification or extenuation for his conduct. [¶] (g) Whether or not defendant acted under extreme duress or under the substantial domination of another person. [¶] (h) Whether or not at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect, or the affects of intoxication. [¶] (i) The age of the defendant at the time of the crime. [¶] (j) Whether or not the defendant was an accomplice to the offense and his participation in the commission of the offense was relatively minor. [¶] (k) Any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime."

"G.  Extreme duress:  [Blackwell] was an active participant in the murder, furnished the murder weapon, and organized the cleanup attempt.  He was not under duress.

"H.  Mental disease or defect or intoxication impairing capacity to appreciate criminality:  There is no evidence that [Blackwell] suffered from a disease or defect.  There is evidence that he has achieved only a low level of education.  It is possible [Blackwell] was under the influence of methamphetamine but there is no evidence that his ability to appreciate the criminality of what he did was impaired.

"I.  Age:  [Blackwell] was within six months of becoming an adult.

"J.  Accomplice with minor participation:  [Blackwell] was an active participant.  He organized the murder, arranged for a ride to the crime scene, and broke into the bedroom of the victim.

"K.  Circumstances extenuating gravity:  There are no such circumstances."

The trial court also considered the following factors in aggravation:

"A1.  Crime of great cruelty viciousness and callousness.  [Blackwell] broke into the bedroom of a victim lying on his bed and participated in the execution of the victim;

"A3.  Vulnerability of the victim.  The victim was at home lying in bed at the time that he was executed.

"A4.  Inducement of others to participate.  [Blackwell] planned the crime and obtained a ride to the scene both to commit the murder and an aborted attempt to clean up the scene afterward.  [Blackwell] also furnished the gun which was the murder weapon.

"A8.  Planning and sophistication.  This was not a crime of passion, but a well-planned residential burglary.  The execution was planned in advance of the entry into the bedroom.

"B1.  Violent conduct.  [Blackwell] exhibits an escalating level of violence as a juvenile culminating in the execution style murder for which he was convicted.

"B5.  Performance on probation.  While a ward of the court as a juvenile, [Blackwell] escaped twice, committed new offenses, and was found in possession of weapons."

11

The trial court determined, "[t]here are no applicable factors in mitigation." It explained: "A1. [Blackwell] was an active rather than passive participant in the crime. [¶] A2. The victim did not initiate or willingly participate in the crime. [¶] A3. There were no unusual circumstances such as great provocation to make it unlikely that the crime would occur. [¶] A4. No coercion or duress has been shown. [¶] A5. [Blackwell] was not induced by others and did show a predisposition to commit the offense. [¶] A6. [Blackwell] did not exercise caution to avoid harm. [¶] A7. There is no claim of right shown. [¶] A8. The crime was not committed to provide for the necessities of life. [¶] A9. [Blackwell] was not abused by the victim. [¶] B1. [Blackwell] has a substantial prior record. [¶] B2. [Blackwell] has not demonstrated a mental condition which reduces his culpability. [¶] B3. [Blackwell] did not acknowledge culpability at an early stage. [¶] B4. Probation is precluded in this case. [¶] B5. Restitution is not an issue. [¶] B6. There is no evidence that [Blackwell] could perform satisfactorily when under the jurisdiction of the juvenile court. To the contrary, he escaped a number of times, committed crimes, was found in possession of weapons, and created disruption at the Juvenile Hall by engaging in gang violence and by taunting rival gang members." Blackwell filed a timely notice of appeal.

## II.  DISCUSSION

Blackwell argues his LWOP sentence must be reversed for the following reasons: (1) the sentence violates his Sixth Amendment rights under *Apprendi, supra,* 530 U.S. 466 because it exceeds the punishment allowable absent a jury finding of irreparable corruption; (2) his sentence amounts to cruel and unusual punishment under the Eighth Amendment, as construed in *Graham v. Florida* (2010) 560 U.S. 48 (*Graham*), because he did not personally kill or intend to kill Carreno; (3) the trial court violated both *Miller, supra,* 132 S.Ct. 2455 and *Ring v. Arizona* (2002) 536 U.S. 584 (*Ring*) in "elevating" his punishment to LWOP in reliance on a finding in conflict with the jury's implicit findings; (4) the trial court abused its discretion; and (5) the trial court violated *Graham* in considering his CDCR records from the time period after his original sentencing. Blackwell's arguments are without merit as they are premised on fundamental

12

misconceptions about the application of *Miller, Graham*, section 190.5(b), as well as *Apprendi* and its progeny.

A.    *Legal Framework*

The primary question presented by Blackwell's appeal is one of first impression in California.  Who determines the sentence in a case involving the potential for imposition of LWOP against a juvenile offender tried as an adult and convicted of first degree murder with special circumstances—the court or a jury?  Blackwell argues that the Eighth Amendment limits on juvenile sentencing established in *Miller* and *Graham* trigger a Sixth Amendment right to jury findings before a juvenile offender convicted of homicide can be sentenced to LWOP.  Our review leads us to a different conclusion.  As the question involves the intersection of the Sixth and Eighth Amendments to the federal Constitution, we begin by summarizing the relevant precedent from the United States Supreme Court.

The Sixth Amendment provides:  "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury . . . ."  "The Federal Constitution's jury-trial guarantee assigns the determination of certain facts to the jury's exclusive province."  (*Oregon v. Ice* (2009) 555 U.S. 160, 167.)  "This right, in conjunction with the Due Process Clause, requires that each element of a crime be proved to a jury beyond a reasonable doubt."  (*Hurst v. Florida* (2016) 577 U.S. ___, ___ [136 S.Ct. 616, 621].)  In *Apprendi,* the United States Supreme Court held:  "Other than the fact of a prior conviction, any fact that increases the penalty for a crime *beyond the prescribed statutory maximum* must be submitted to a jury, and proved beyond a reasonable doubt."  (*Apprendi, supra*, 530 U.S. at p. 490, italics added.)  In *Blakely v. Washington* (2004) 542 U.S. 296 (*Blakely*), the high court further defined "statutory maximum" as the "maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant*."  (*Id.* at p. 303.)

The United States Supreme Court has since applied "*Apprendi*'s rule to facts subjecting a defendant to the death penalty, [(*Ring, supra,* 536 U.S. at pp. 602, 609)], facts allowing a sentence exceeding the 'standard' range in Washington's sentencing

13

system, [(*Blakely, supra,* 542 U.S., at pp. 304–305)], and facts prompting an elevated sentence under then-mandatory Federal Sentencing Guidelines, [(*United States v. Booker* (2005) 543 U.S. 220, 244)]." (*Oregon v. Ice, supra,* 555 U.S. at p. 167.)  And in *Cunningham v. California* (2007) 549 U.S. 270 (*Cunningham*), the high court held California's then operative determinate sentencing law (DSL) violated the Sixth Amendment by "allow[ing] a judge to impose a sentence above the statutory maximum based on a fact, other than a prior conviction, not found by a jury or admitted by the defendant." (*Cunningham*, at p. 275.)[8]

"The high court's decision in [*Oregon v. Ice,*] *supra*, 555 U.S. 160, refined and circumscribed the scope of the rule of *Apprendi* and its progeny in significant ways." (*People v. Mosley* (2015) 60 Cal.4th 1044, 1057.)  In concluding that the decision to impose consecutive sentences is not subject to *Apprendi*, the *Oregon v. Ice* court observed:  "The [*Apprendi*] rule's animating principle is the preservation of the jury's historic role as a bulwark between the State and the accused at the trial for an alleged offense.  [Citation.]  Guided by that principle, our opinions make clear that the Sixth Amendment does not countenance legislative encroachment on the jury's traditional domain." (*Oregon v. Ice,* at p. 168.)  But the Supreme Court also emphasized that *Apprendi* does not extend "beyond the offense-specific context that supplied the historic grounding for the decisions." (*Oregon v. Ice,* at p. 163.)

The Eighth Amendment provides:  "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."  This provision

---

[8] Following *Cunningham, supra*, 549 U.S. 270, our Legislature reformed the DSL and eliminated its provision that the middle term is the default term in the absence of aggravating or mitigating factors. (*People v. Sandoval* (2007) 41 Cal.4th 825, 850; former § 1170, subd. (b), as amended by Stats. 2007, ch. 3, § 2, p. 5 ["[w]hen a judgment of imprisonment is to be imposed and the statute specifies three possible terms, the choice of the appropriate term shall rest within the sound *discretion* of the court" (italics added)].)  The DSL was also amended to eliminate the prior requirement that the court state "facts" in support of its decision to impose an upper or lower term.  (Compare Stats. 2007, ch. 3, § 2, p. 5 with Stats. 2004, ch. 747, § 1, p. 5807.)

"guarantees individuals the right not to be subjected to excessive sanctions" and "flows from the basic ' "precept of justice that punishment for crime should be graduated and proportioned" ' " to both the offense and the offender. (*Roper v. Simmons* (2005) 543 U.S. 551, 560 (*Roper*).) "The concept of proportionality is central to the Eighth Amendment." (*Graham, supra*, 560 U.S. at p. 59.) Cases addressing the proportionality of sentences have fallen into two general classifications: challenges to the length of a term-of-years sentence as disproportionate in a particular case, and categorical challenges to the type of sentence imposed in certain types of cases, against a certain type of defendant. (*Ibid.*)

Particularly relevant here, the Eighth Amendment prohibition "encompasses the 'foundational principle' that the 'imposition of a State's most severe penalties on juvenile offenders cannot proceed as though they were not children.' (*Miller, supra,* [132 S.Ct. at p. 2466].) From this principle, the high court has derived a number of limitations on juvenile sentencing: (1) no individual may be executed for an offense committed when he or she was a juvenile (*Roper, supra,* 543 U.S. at p. 578); (2) no juvenile who commits a nonhomicide offense may be sentenced to LWOP (*Graham, supra,* 560 U.S. at p. 74); and (3) no juvenile who commits a homicide offense may be automatically sentenced to LWOP ([*Miller,* at p. 2460])." (*People v. Franklin* (2016) 63 Cal.4th 261, 273–274.)

"As to homicide offenses, the United States Supreme Court has held that a state may not impose a *mandatory* LWOP sentence on a juvenile offender, although the sentencing court might impose such a sentence if it has adequately considered the offender's age and environment and found ' "irreparable corruption." ' (*Miller*[*, supra,* 132 S.Ct. at pp. 2468–2469] [noting LWOP sentence for a juvenile offender would be 'uncommon' and imposed against the ' "rare juvenile offender whose crime reflects irreparable corruption" '] . . . .)" (*People v. Lewis* (2013) 222 Cal.App.4th 108, 118.) Building on its categorical precedents in *Roper, supra,* 543 U.S. 551 and *Graham, supra,* 560 U.S. 48, the *Miller* court explained, "the Eighth Amendment forbids a sentencing scheme that mandates life in prison without the possibility of parole for juvenile offenders. [Citation.] By making youth (and all that accompanies it) irrelevant to

15

imposition of that harshest prison sentence, such a scheme poses too great a risk of disproportionate punishment." (*Miller,* at p. 2469.)

The *Miller* court discussed the reasons that juveniles are "constitutionally different" from adults for sentencing purposes, including their lack of maturity and underdeveloped sense of responsibility, their vulnerability to outside pressure and negative influences, their limited control over their own environment and their inability to extricate themselves from crime-producing settings, and their greater ability to change due to their possession of a character not as " 'well formed' " as that of an adult. (*Miller, supra,* 132 S.Ct. at p. 2464.) The court further observed that scientific studies show " ' "[o]nly a relatively small proportion of adolescents" ' who engage in illegal activity ' "develop entrenched patterns of problem behavior." ' " (*Ibid.*) These characteristics were deemed "at odds" with the defining features of LWOP, which " 'forswears altogether the rehabilitative ideal' " and "reflects 'an irrevocable judgment about [an offender's] value and place in society . . . .' " (*Id.* at p. 2465.) Thus, mandatory LWOP for a juvenile "disregards the possibility of rehabilitation even when the circumstances most suggest it." (*Id.* at p. 2468.) However, in prohibiting mandatory LWOP sentences, *Miller* made clear that it was not establishing a categorical prohibition on LWOP sentences for juvenile offenders convicted of homicide, but requiring individualized sentencing for such offenses. (*Id.* at pp. 2466, fn. 6, 2469.)

B.    *Is a Jury Finding of Irreparable Corruption Required Under* Apprendi?

Blackwell's primary premise on appeal is that "the categorical Eighth Amendment limits" established in *Miller* and *Graham* trigger a Sixth Amendment right to jury findings before a juvenile offender convicted of homicide can be sentenced to LWOP. According to Blackwell, absent a jury finding of irreparable corruption, a sentence of 25-years-to-life is the "statutory maximum" a juvenile offender convicted of homicide can receive under section 190.5(b), and/or *Miller*. Thus, the trial court's imposition of an LWOP term violated his Sixth Amendment right to a jury trial because a judge, rather than a jury, made a "finding" he was irreparably corrupt. Blackwell's first premise is flawed.

16

*Miller* does not address the issue of who should decide whether a juvenile offender receives an LWOP sentence. The court simply states: "*Graham, Roper*, and our individualized sentencing decisions make clear that *a judge or jury* must have the opportunity to consider mitigating circumstances before imposing the harshest possible penalty for juveniles." (*Miller, supra*, 132 S.Ct. at p. 2475, italics added.) Instead, Blackwell reasons that a jury must determine the sentence because section 190.5(b) and/or *Miller* create a new "statutory maximum" sentence of 25 years to life for juvenile offenders convicted of special circumstance murder. We first address California's statutory scheme, an area in which we do not write on a blank slate.

*Miller* involved two 14-year-old offenders who were tried as adults, convicted of murder, and sentenced to LWOP terms under state laws that gave the sentencing court no discretion to impose a lesser sentence. (*Miller, supra,* 132 S.Ct. at pp. 2460–2463, 2468.) Section 190.5(b) differs from the mandatory schemes found unconstitutional in *Miller*, because it has long afforded courts discretion to impose a term that affords the possibility of parole. After *Miller*, our Supreme Court has construed this discretion as involving no presumption in favor of LWOP for defendants who were tried as adults but were 16 or 17 when they committed first degree murder with a special circumstance. (*Gutierrez, supra,* 58 Cal.4th at p. 1360; *People v. Palafox* (2014) 231 Cal.App.4th 68, 89.)

In *Gutierrez*, our Supreme Court considered LWOP sentences imposed against two 17-year-olds who, like Blackwell, had been convicted of first-degree murder with special circumstances. (*Gutierrez, supra,* 58 Cal.4th at p. 1360.) The high court first observed that "[f]or two decades, the Courts of Appeal have uniformly interpreted section 190.5(b) as establishing a presumption in favor of [LWOP] for juvenile offenders who were 16 years of age or older when they committed special circumstance murder." (*Gutierrez*, at p. 1369.) In order to render section 190.5(b) " ' "free from doubt as to its constitutionality" ' " (*Gutierrez*, at p. 1387), the court disapproved that presumption and construed section 190.5(b), as "confer[ring] discretion on a trial court to sentence a 16- or 17-year-old juvenile convicted of special circumstance murder to [LWOP] or to 25 years to life, *with no presumption in favor of* [*LWOP*]" (*Gutierrez,* at p. 1360, italics added).

17

(See *id.* at pp. 1379–1380.)  So construed, section 190.5(b) does not violate the Eighth Amendment "[b]ecause the sentencing regime created by section 190.5(b) authorizes and indeed requires consideration of the distinctive attributes of youth highlighted in *Miller. . . .*"  (*Gutierrez,* at p. 1361; *id.* at p. 1387.)

The *Gutierrez* court did not address the *Apprendi* issue Blackwell raises. *Gutierrez* merely stated that "a sentencing court" considering LWOP or a 25-years-to-life term for a juvenile offender must consider the aggravating and mitigating factors enumerated in section 190.3 and the California Rules of Court, as well as the offender's chronological age and its hallmark features, any information regarding the juvenile's family and home environment, all information available regarding the circumstances of the homicide offense, including the extent of the juvenile's participation and the existence of any familial or peer pressure, any information as to whether the juvenile might have been charged and convicted of a lesser offense if not for the incompetencies of youth, and any other information bearing on the possibility of rehabilitation. (*Gutierrez, supra,* 58 Cal.4th at pp. 1387–1389.)  The court reiterated, "the trial court must consider all relevant evidence bearing on the 'distinctive attributes of youth' discussed in *Miller* and how those attributes '*diminish* the penological justifications for imposing the harshest sentences on juvenile offenders.'  [Citation.]  To be sure, not every factor will necessarily be relevant in every case.  For example, if there is no indication in the presentence report, in the parties' submissions, or in other court filings that a juvenile offender has had a troubled childhood, then that factor cannot have *mitigating* relevance. But *Miller* 'require[s] [the sentencer] to take into account how children are different, and *how those differences counsel against* irrevocably sentencing them to a lifetime in prison.' " (*Gutierrez*, at p. 1390, italics added.)

Thus, contrary to Blackwell's assertion, 25 years to life is not the "statutory maximum" under section 190.5(b).  (*Gutierrez, supra,* 58 Cal.4th at pp. 1360, 1379–1380, 1387.)  Section 190.5(b) and *Gutierrez* make clear that judges in California have discretion to determine the appropriate sentence for a 16 or 17-year-old offender convicted of first degree murder with special circumstances—LWOP or life with the

18

possibility of parole after 25 years. (*Gutierrez,* at pp. 1360, 1379–1380, 1387.) Nor did the *Gutierrez* court "suggest section 190.5(b) evinces a preference *for* a sentence of 25 years to life." (*People v. Palafox, supra,* 231 Cal.App.4th at p. 91; accord, *Gutierrez,* at p. 1379.)

Thus, we agree with the People that after the jury convicted Blackwell of first degree murder with special circumstances, LWOP was the maximum statutory sentence the court could impose. The trial court's consideration of the *Miller/Gutierrez* factors relating to the offense and offender in exercising its discretion to impose sentence within a prescribed range did not violate *Apprendi.* (See *Alleyne v. United States* (2013) 570 U.S. ___, ___ [133 S.Ct. 2151, 2163] ["[w]e have long recognized that broad sentencing discretion, informed by judicial factfinding, does not violate the Sixth Amendment"]; *Cunningham, supra,* 549 U.S. at p. 294 [in the wake of *Apprendi* and *Blakely* some states "have chosen to permit judges genuinely 'to exercise broad discretion . . . within a statutory range,' which, 'everyone agrees,' encounters no Sixth Amendment shoal" (fn. omitted)]; *Apprendi, supra,* 530 U.S. at p. 481 ["nothing in this history suggests that it is impermissible for judges to exercise discretion—taking into consideration various factors relating both to offense and offender—in imposing a judgment *within the range* prescribed by statute"]; *People v. Sandoval, supra,* 41 Cal.4th at pp. 843–844, 852 [reformation of DSL to afford trial court broad discretion to select among three specified terms cures constitutional defect in statute].)

Nor does Blackwell's reliance on *Ring, supra,* 536 U.S. 584 persuade us to reach a different conclusion. In *Ring*, the United States Supreme Court held the Sixth Amendment requires a jury, not a judge, to make the determination of any aggravating factor that makes a defendant *eligible for imposition* of the death penalty. (*Ring,* at p. 609.) However, *Ring* has had limited impact on California's death penalty scheme. (*People v. Prieto* (2003) 30 Cal.4th 226, 263.)

"[A] state capital sentencing system must: (1) rationally narrow the class of death-eligible defendants; and (2) permit a jury to render a reasoned, individualized sentencing determination based on a death-eligible defendant's record, personal characteristics, and

19

the circumstances of his crime." (*Kansas v. Marsh* (2006) 548 U.S. 163, 173–174.)  In holding that a jury must find beyond a reasonable doubt any fact that makes a defendant *eligible* for imposition of the death penalty, *Ring* involved the first *Kansas v. Marsh* requirement.[9]  (*Ring, supra,* 536 U.S. at p. 609.)  Yet, "[t]he federal Constitution does not require the jury to find beyond a reasonable doubt that the prosecution proved each aggravating factor, that the circumstances in aggravation outweigh those in mitigation, or that death is the appropriate penalty."  (*People v. Hawthorne* (1992) 4 Cal.4th 43, 79.)

" '[U]nder the California death penalty scheme, once the defendant has been convicted of first degree murder and one or more special circumstances has been found true beyond a reasonable doubt, *death is no more than the prescribed statutory maximum for the offense*; the only alternative is life imprisonment without the possibility of parole.' [Citation.]  Thus, in the penalty phase, the jury merely weighs the factors enumerated in section 190.3 and determines 'whether a defendant eligible for the death penalty should in fact receive that sentence.'  (*Tuilaepa v. California* (1994) 512 U.S. 967, 972.)  No single factor therefore determines which penalty—death or [LWOP]—is appropriate. [¶] [T]he penalty phase determination 'is inherently moral and normative, not factual . . . .'

***

[9] *Ring* involved Arizona's first-degree murder statute, which " 'authorizes a maximum penalty of death only in a formal sense,' [citation], for it explicitly cross-references the statutory provision requiring the finding of an aggravating circumstance before imposition of the death penalty."  (*Ring, supra,* 536 U.S. at p. 604; *id.* at p. 597.)  Thus, " '[a] defendant convicted of first-degree murder in Arizona cannot receive a death sentence unless a judge makes the factual determination that a statutory aggravating factor exists.  Without that critical finding, the maximum sentence to which the defendant is exposed is life imprisonment, and not the death penalty.' "  (*Id.* at p. 596.)  "Because Arizona's enumerated aggravating factors operate as 'the functional equivalent of an element of a greater offense,' " the court held that "the Sixth Amendment requires that they be found by a jury."  (*Id.* at p. 609.)

The high court has frequently used the terms " 'aggravating circumstance' " or " 'aggravating factor' to refer to those statutory factors which determine death eligibility . . . .  This terminology becomes confusing when, as in [California], a State employs the term 'aggravating circumstance' to refer to factors that play a different role, determining which defendants *eligible* for the death penalty will actually *receive* that penalty."  (*Brown v. Sanders* (2006) 546 U.S. 212, 216, fn. 2.)

20

[Citation.] Because any finding of aggravating factors during the penalty phase does not 'increase[] the penalty for a crime beyond the prescribed statutory maximum' (*Apprendi, supra*, 530 U.S. at p. 490), *Ring* imposes no new constitutional requirements on California's penalty phase proceedings." (*People v. Prieto, supra,* 30 Cal.4th at p. 263, italics added; accord*, People v. Prince* (2007) 40 Cal.4th 1179, 1297–1298; *People v. Manriquez* (2005) 37 Cal.4th 547, 589.)

Sections 190.2 and 190.5(b), similarly require a special circumstance finding before a 16 or 17-year-old convicted of first degree murder is eligible for an LWOP term.[10] Once such a juvenile offender has been convicted of first degree murder and one or more special circumstances has been found true beyond a reasonable doubt, the sentencing court need not find any particular fact before imposing LWOP. The "statutory maximum" for *Apprendi* purposes was determined when the jury returned its guilty verdict on the charge of first degree murder with special circumstances. (§ 190.5(b); *Gutierrez, supra,* 58 Cal.4th at pp. 1360, 1379–1380, 1387.) No additional fact finding by the judge was required to impose an LWOP sentence.

The only cited authority supporting Blackwell's argument is *People v. Skinner* (2015) 312 Mich.Ct.App. 15 (*Skinner*), in which a divided panel of the Michigan Court of Appeals held "the Sixth Amendment mandates that juveniles convicted of homicide who face the possibility of a sentence of [LWOP] have a right to have their sentences determined by a jury." (*Id.* at p. 20.)

In *Skinner*, the juvenile defendant was convicted of first-degree premeditated murder, attempted murder, and conspiracy to commit murder. In a proceeding under their applicable sentencing statute (Mich. Comp. Laws, § 769.25),[11] the defendant was

---

[10] By accepting Blackwell's analogy to the death penalty, we do not mean to suggest that death is not " 'qualitatively different from all other punishments.' " (*People v. Jones* (2012) 54 Cal.4th 1, 81.) We reject Blackwell's unsupported attempt to import wholesale the high court's adult death penalty jurisprudence.

[11] In response to *Miller*, the Michigan Legislature enacted Michigan Compiled Laws section 769.25 to permit the prosecutor to move for imposition of an LWOP

21

sentenced to LWOP for the first-degree murder conviction. (*Skinner, supra,* 312 Mich.Ct.App. at pp. 21–22.) The defendant argued on appeal that the facts necessary to impose such a sentence under *Miller* and the Michigan sentencing statute had to be found by a jury because such facts exposed her to a penalty greater than otherwise authorized by the jury's verdict. (*Skinner,* at pp. 22, 32.) Relying on *Apprendi, supra,* 530 U.S. 466 and its progeny, the *Skinner* court agreed. The court relied on the sentencing statute, which provided that absent a prosecutor's motion, " 'the court *shall sentence the defendant to a term of years*.' " (*Skinner,* at p. 43.) Thus, "[i]n order to enhance a juvenile's *default* sentence to [LWOP], absent a waiver, a jury must make findings on the *Miller* factors as codified [in the statute] to determine beyond a reasonable doubt whether the juvenile's crime reflects irreparable corruption." (*Id.* at pp. 58–59, italics added.)

*Skinner* is distinguishable because the Michigan statute, unlike our own, established a default term-of-years sentence and "the *Miller* factors are used to seek enhancement of defendant's punishment." (*Skinner, supra,* 312 Mich.Ct.App. at p. 52; *id.* at p. 43.) Our Supreme Court, on the other hand, has explicitly construed section 190.5(b) to provide discretion to the sentencing court to choose either 25 years to life or LWOP. (*Gutierrez, supra,* 58 Cal.4th at pp. 1360, 1379–1380, 1387.) LWOP *is* the statutory maximum sentence for a 16 or 17-year old convicted of first-degree murder with special circumstances. (*Ibid.*; § 190.5(b).)[12]

Our statutory analysis does not completely resolve Blackwell's argument, however. Blackwell raises an additional argument that, notwithstanding section 190.5(b)

---

sentence after conviction on an eligible offense. On such a motion, the trial court was instructed to conduct a hearing to consider the *Miller* factors, in addition to any other relevant aggravating and mitigating circumstances specified under the statute. (*Skinner, supra,* 312 Mich.Ct.App. at pp. 28–31.)

[12] Subsequent authority suggests *Skinner* is no longer good law in Michigan. (See *People v. Hyatt* (2016) ___ Mich.App. ___ [2016 Mich.App.Lexis 1404] ["[n]either *Miller* nor [the Michigan sentencing statute] implicates the right to a jury trial under *Apprendi* and its progeny"].)

and *Gutierrez*, *Miller* alone imposes a categorical Eighth Amendment limit that acts as a ceiling beyond which a juvenile offender convicted of homicide cannot be sentenced, unless a jury finds beyond a reasonable doubt that he is irreparably corrupt. The People disagree, contending that *Miller* is only about the "process for *selecting the appropriate penalty*, not about . . . determining who is *eligible* for a particular penalty." (Italics added.) Neither position is entirely accurate.

The *Miller* opinion "does not categorically bar a penalty for a class of offenders or type of crime—as, for example, [the high court] did in *Roper* or *Graham*. Instead, it mandates only that a sentencer follow a certain process—considering an offender's youth and attendant characteristics—before imposing a particular penalty." (*Miller, supra,* 132 S.Ct. at p. 2471.) But *Miller* also cautioned: "[G]iven all we have said in *Roper, Graham,* and this decision about children's diminished culpability and heightened capacity for change, we think appropriate occasions for sentencing juveniles to this *harshest possible penalty* will be uncommon. That is especially so because of the great difficulty . . . of distinguishing at this early age between 'the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption.' [Citations.] Although we do not foreclose a sentencer's ability to make that judgment in homicide cases, we require it to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." (*Id.* at p. 2469, italics added & fn. omitted.)

The United States Supreme Court has since concluded that *Miller*'s prohibition on mandatory LWOP for juvenile offenders announced a substantive rule of constitutional law that must be given retroactive effect. (*Montgomery v. Louisiana* (2016) 577 U.S. ___, ___ [136 S.Ct. 718, 729, 732] (*Montgomery*).) In reaching that conclusion, the *Montgomery* court said, "Because *Miller* determined that sentencing a child to [LWOP] is excessive for all but ' "the rare juvenile offender whose crime reflects irreparable corruption," ' [citation], it rendered [LWOP] an unconstitutional penalty for 'a class of defendants because of their status'—that is, juvenile offenders whose crimes reflect the transient immaturity of youth. . . . [¶] . . . *Miller* is no less substantive than are *Roper* and

23

*Graham.* Before *Miller*, every juvenile convicted of a homicide offense could be sentenced to [LWOP]. After *Miller*, it will be the rare juvenile offender who can receive that same sentence. The only difference between *Roper* and *Graham*, on the one hand, and *Miller*, on the other hand, is that *Miller* drew a line between children whose crimes reflect transient immaturity and those rare children whose crimes reflect irreparable corruption. The fact that [LWOP] could be a proportionate sentence for the latter kind of juvenile offender does not mean that all other children imprisoned under a disproportionate sentence have not suffered the deprivation of a substantive right." (*Montgomery,* at p. 734.)

Montgomery is inconsistent with the People's position that *Miller* is entirely procedural, but it is not determinative of Blackwell's Sixth Amendment argument. The *Montgomery* court recognized *Miller* has "a procedural component" and also confirmed *Miller* does *not* require a finding of fact regarding a child's incorrigibility or irrevocable corruption. (*Montgomery, supra,* 136 S.Ct. at pp. 734–735 ["*Miller* did not impose a formal factfinding requirement"]; see *State v. Fletcher* (La.Ct.App. 2014) 149 So.3d 934, 943.) Rather, to comply with *Miller*'s procedural component, "[a] hearing where 'youth and its attendant characteristics' are considered as sentencing factors is necessary to separate those juveniles who may be sentenced to [LWOP] from those who may not. [Citation.] The hearing does not replace but rather gives effect to *Miller*'s substantive holding that [LWOP] is an excessive sentence for children whose crimes reflect transient immaturity." (*Montgomery,* at p. 735.) As the People put it, "irreparable corruption" is not a factual finding, but merely "encapsulates the [absence] of youth-based mitigation."

This brings us to another reason Blackwell's *Apprendi* argument is unpersuasive. Blackwell urges us to apply *Apprendi* beyond situations where the facts authorizing a particular sentence are specified by the Legislature in statutes. (See *Apprendi, supra*, 530 U.S. at p. 490 ["[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed *statutory* maximum must be submitted to a jury, and proved beyond a reasonable doubt" (italics added)]; Russell, *Eighth Amendment Limits and Sixth Amendment Rights* (2015) 56 B.C. L.Rev. 553, 577.) In Blackwell's

24

view, nothing bars the extension of the *Apprendi* principle to not only statutorily prescribed facts, but also to facts with constitutional origins. (See *In re Coley* (2012) 55 Cal.4th 524, 565 (conc. opn. of Liu, J.) [observing that the aggravating factors in *Ring* were statutorily specified, but only "because the high court's Eighth Amendment jurisprudence had required legislatures to specify such factors to distinguish death-eligible crimes"]; *Ring, supra,* 536 U.S. at p. 606 ["States have constructed elaborate sentencing procedures in death cases . . . because of constraints we have said the Eighth Amendment places on capital sentencing"]; *United States v. Booker, supra,* 543 U.S. at pp. 237, 244 [distinction between maximum sentences set by statute and those set by sentencing guidelines "lacks constitutional significance"].) But we know of no authority directly holding *Apprendi* applicable to such constitutionally prescribed facts.

In fact, there is authority to the contrary. In *Enmund v. Florida* (1982) 458 U.S. 782 (*Enmund*), the United States Supreme Court concluded that the Eighth Amendment forbids the imposition of the death penalty on "one . . . who aids and abets a felony in the course of which a murder is committed by others but who does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed." (*Id.* at p. 797; see *id.* at pp. 788, 801.) In *Tison v. Arizona* (1987) 481 U.S. 137 (*Tison*), the high court qualified that ruling, holding "major participation in the felony committed, combined with reckless indifference to human life, is sufficient to satisfy the *Enmund* culpability requirement." (*Id.* at p. 158, fn. omitted.)

In a case decided before *Apprendi* or *Ring*, the United States Supreme Court held the Sixth Amendment does not require *Enmund/Tison* findings be made by a jury. (*Cabana v. Bullock* (1986) 474 U.S. 376, 386 (*Cabana*), disapproved on other grounds by *Pope v. Illinois* (1987) 481 U.S. 497, 503–504, fn. 7.) The court reasoned: "[O]ur ruling in *Enmund* does not concern the guilt or innocence of the defendant—it establishes no new elements of the crime of murder that must be found by the jury. . . . *Enmund* holds only that the principles of proportionality embodied in the Eighth Amendment bar imposition of the death penalty upon a class of persons who may nonetheless be guilty of the crime of capital murder as defined by state law: that is, the class of murderers who

25

did not themselves kill, attempt to kill, or intend to kill. [¶] The decision whether a particular punishment—even the death penalty—is appropriate in any given case is not one that we have ever required to be made by a jury." (*Cabana,* at p. 385, fn. omitted.) Some of the *Cabana* court's reasoning is reminiscent of *Oregon v. Ice*. (*Cabana*, at p. 386 ["decision whether a sentence is so disproportionate as to violate the Eighth Amendment in any particular case, like other questions bearing on whether a criminal defendant's constitutional rights have been violated, has long been viewed as one that a trial judge or an appellate court is fully competent to make"].) Yet other portions of *Cabana*'s reasoning appear irreconcilable with *Apprendi* and *Ring*. (See *Cabana*, at p. 386 ["the rule remains a substantive limitation on sentencing, and like other such limits it need not be enforced by the jury"]; *Ring, supra*, 536 U.S. at pp. 589, 598, 609 [disapproving *Walton v. Arizona* (1990) 497 U.S. 639, which "drew support from *Cabana*"].)[13]

The high court has never explicitly overruled *Cabana*'s holding that a judge may make the Eighth Amendment findings mandated by *Enmund* and *Tison*. Because the *Enmund/Tison* findings serve to disqualify otherwise death-eligible defendants, and thus *mitigate* punishment, we view *Cabana*'s holding as not inconsistent with *Apprendi*. (See *People v. Ring* (2003) 204 Ariz. 534, 564 ["difference between aggravating circumstances as substantive elements of a greater offense and the *Enmund-Tison* findings as a *restraint* on capital sentencing dictates our decision that *Apprendi/Ring* does not require these findings to be made by the jury" (italics added)]; *People v. Retanan* (2007) 154 Cal.App.4th 1219, 1229–1230 [*Apprendi* and its progeny not implicated by

---

[13] The defendant's argument in *Ring* was "tightly delineated." (*Ring, supra,* 536 U.S. at p. 597, fn. 4.) The defendant argued "only that the Sixth Amendment required jury findings on the aggravating circumstances asserted against him." (*Ibid.*) The defendant made no Sixth Amendment claim that a jury was required to find mitigating circumstances or make the ultimate determination whether to impose the death penalty. (*Ibid.*) Contrary to Blackwell's repeated suggestion, the *Ring* case also did not involve an *Apprendi* challenge to the trial court's *Enmund/Tison* finding that the defendant was the actual killer. (*Id.* at pp. 594–595, 597, fn. 4.)

consideration of factors that mitigate punishment]; *People v. Cleveland* (2001) 87 Cal.App.4th 263, 267 [same]; *People v. Glasper* (2003) 113 Cal.App.4th 1104, 1115 [same].)

Similarly, *Miller* does not require irreparable corruption be proved to a jury beyond a reasonable doubt in order to "aggravate" or "enhance" the sentence for juvenile offender convicted of homicide. *Miller,* like *Enmund/Tison*, avoids disproportionate punishment by mandating consideration of mitigating circumstances specific to youth. This is not the same as increasing the punishment authorized by a jury's verdict based on a fact not found by the jury. (*State v. Fletcher, supra,* 149 So.3d at p. 943.)

Our review of California's statutory scheme and the relevant Eighth Amendment jurisprudence leads us to conclude that *Miller, Gutierrez,* and section 190.5(b), require only a discretionary consideration of mitigating circumstances so that a sentencer can reach a moral judgment about an individual juvenile's irreparable corruption—i.e., a determination of what sentence is proportionate to a particular offense and offender. We find no constitutional or statutory requirement that this exercise be accomplished by a jury.

C. *Does the Eighth Amendment Categorically Prohibit LWOP for Juvenile Offenders Who Do Not Kill or Intend to Kill?*

In an attempt to extend *Graham*, Blackwell also claims that an LWOP sentence is categorically prohibited under the Eighth Amendment unless a juvenile offender personally killed or intended to kill. He asserts the jury found he neither killed nor intended to kill, and his sentence consequently constitutes cruel and unusual punishment. "Whether a punishment is cruel and/or unusual is a question of law subject to our independent review, but underlying disputed facts must be viewed in the light most favorable to the judgment." (*People v. Palafox, supra,* 231 Cal.App.4th at p. 82.)

*Graham* does provide a categorical limit on punishment—the Eighth Amendment prohibits LWOP for juvenile offenders who commit *nonhomicide* offenses. (*Graham, supra,* 560 U.S. at pp. 74–75, 82.) In reaching that conclusion, the court applied a two-step approach appropriate for categorical challenges to punishment as cruel and unusual:

"The Court first considers 'objective indicia of society's standards, as expressed in legislative enactments and state practice' to determine whether there is a national consensus against the sentencing practice at issue. [Citation.] Next, guided by 'the standards elaborated by controlling precedents and by the Court's own understanding and interpretation of the Eighth Amendment's text, history, meaning, and purpose,' [citation], the Court must determine in the exercise of its own independent judgment whether the punishment in question violates the Constitution." (*Id.* at p. 61.)

The *Graham* court found that although legislatively prohibited in very few jurisdictions, an examination of actual sentencing practices revealed a consensus against the use of LWOP for juveniles committing nonhomicide offenses. (*Graham, supra,* 560 U.S. at p. 62.) Because "defendants who do not kill, intend to kill, *or foresee that life will be taken* are categorically less deserving of the most serious forms of punishment than are murderers" (*id.* at p. 69, italics added), and because of the severity of LWOP sentences applied to juveniles who are, by reason of their immaturity, less culpable when compared to adults (*id.* at pp. 68, 69, 74–75), the practice of sentencing minors to LWOP was deemed unjustifiable under penological theory and unconstitutional in nonhomicide cases. (*Id.* at p. 74). The court reasoned: "[W]hen compared to an adult murderer, a juvenile offender *who did not kill or intend to kill* has a twice diminished moral culpability. The age of the offender and the nature of the crime each bear on the analysis." (*Id.* at p. 69, italics added.)

Recognizing that *Graham*'s categorical prohibition is limited only to *nonhomicide* cases, Blackwell argues that its rationale should also prohibit LWOP for a juvenile offender convicted of homicide who did not personally kill or intend to kill. According to Blackwell, the jury's rejection of the firearm enhancement allegations demonstrates he was convicted as an aider and abettor on a felony-murder theory and became eligible for LWOP only because someone else fired a fatal shot.

Blackwell both mischaracterizes the implications of the jury's verdict and reads *Graham* too expansively. The jury's rejection of the firearm allegations may simply reflect "a reasonable doubt in the minds of the jurors that [Blackwell] specifically used a

28

[gun]. It does not show the reverse, that the jury specifically found [that Blackwell] was an aider and abettor. . . . The jury may merely have believed, and most likely did believe, that [Blackwell] was guilty of murder as either a personal [gun] user or an aider and abettor but it may have been uncertain exactly which role [Blackwell] played." (*People v. Santamaria* (1994) 8 Cal.4th 903, 919, italics omitted; see *People v. Thompson* (2010) 49 Cal.4th 79, 120.)

In any event, even if we assume Blackwell was convicted as an aider and abettor under a felony-murder theory, it does not follow that his LWOP sentence is categorically barred. The only authority supporting Blackwell's proposed extension of *Graham* is a concurring opinion in *Miller*, signed only by two justices. (See *Miller, supra*, 132 S.Ct. at pp. 2475–2477 (conc. opn. of Breyer, J.).) Joined by Justice Sotomayor, Justice Breyer wrote: "I join the Court's opinion in full. I add that, if the State continues to seek a sentence of [LWOP] for Kuntrell Jackson, there will have to be a determination whether Jackson 'kill[ed] or intend[ed] to kill' the robbery victim. [(*Graham, supra*, 560 U.S. at p. 69.)] In my view, without such a finding, the Eighth Amendment as interpreted in *Graham* forbids sentencing Jackson to such a sentence, regardless of whether its application is mandatory or discretionary under state law. [¶] In *Graham* we said that 'when compared to an adult murderer, a juvenile offender who did not kill or intend to kill has a twice diminished moral culpability.' *Ibid*. . . . And we concluded that, because of this 'twice diminished moral culpability,' the Eighth Amendment forbids the imposition upon juveniles of a sentence of [LWOP] for nonhomicide cases. [(*Graham,* at pp. 69, 74–75.)]" (*Id.* at p. 2475, italics omitted.) Justice Breyer continued: "Indeed, even juveniles who meet the *Tison* standard of 'reckless disregard' may not be eligible for [LWOP]. Rather, *Graham* dictates a clear rule: The only juveniles who may constitutionally be sentenced to [LWOP] are those convicted of homicide offenses who 'kill or intend to kill.' " (*Id.* at p. 2476.)

But the *Miller* majority did not adopt Justice Breyer's suggested categorical rule. Instead, in illustrating the problem of mandatory LWOP sentences for juvenile offenders convicted of homicide, it observed that whether a juvenile actually killed, intended to kill,

or acted with reckless indifference to human life were circumstances affecting the juvenile's culpability for the offense that should be considered in determining punishment. (*Miller, supra,* 132 S.Ct. at p. 2468, citing *Graham, supra,* 560 U.S. at p. 69.)

In asking us to announce a categorical bar against LWOP for juvenile felony murder offenders who did not kill or intend to kill, Blackwell seeks a significant extension of the high court's Eighth Amendment jurisprudence. We decline to read *Graham* for that broader proposition, especially where Blackwell has not even attempted to argue there is a national consensus against imposing an LWOP sentence in a case where a 17-year-old defendant committed a homicide offense that would have rendered him eligible for the death penalty had he been an adult.[14] (§ 190.2.)

D.      *Purported Conflict in "Fact Finding"*

In an extension of his initial arguments, Blackwell insists "the jury made a factual finding [he] was not the shooter" and contends the trial court improperly "elevated" his punishment to LWOP based on a finding in conflict with the jury's. In resentencing Blackwell to LWOP, the trial court made the following observations regarding the circumstances of the offense: "The evidence indicates that Blackwell fully participated in the planning, execution and attempted cover-up of the crime, the brutal execution of the victim, who was lying in his own bed. There is no indication of familial or peer pressure. There is some evidence that Blackwell was using methamphetamine around the time of the crime, but no evidence of intoxication during the commission of the crime. At trial, the jury verdict found not true the allegation that Blackwell used a gun. However, before trial, Blackwell admitted to his girlfriend . . . that he shot the victim with his 9 mm gun. At trial, Ms. Pollard testified credibly to this fact."

---

[14] The jury could not have found the robbery-murder special circumstance to be true unless it determined that Blackwell, if not the actual killer, either intended to kill or was a major participant in the underlying felony and acted with reckless indifference to human life. (§ 190.2, subd. (d); *People v. Estrada* (1995) 11 Cal.4th 568, 575; see *Tison, supra,* 481 U.S. at p. 158.)

30

Blackwell insists the trial court violated both the Sixth and Eighth Amendments by "basing [the] choice of LWOP primarily on [the judge's] own belief that [Blackwell] was the actual killer, despite the jurors' acquittal on the allegations of personal use and intentional discharge of a firearm." Blackwell maintains that "[b]ecause 12 jurors found [he] was not the actual killer," the judge's finding offended the Sixth Amendment.

As we discussed above, we do not agree with Blackwell's interpretation of the jury's verdicts. (See *People v. Santamaria, supra,* 8 Cal.4th at p. 919; *People v. Thompson, supra,* 49 Cal.4th at p. 120.) The jury made no affirmative finding that Blackwell was *not* the killer. In imposing a sentence, the trial court is not prohibited from making findings of fact that are inconsistent with a jury's verdict of *acquittal* on other counts. (*People v. Towne* (2008) 44 Cal.4th 63, 71 (*Towne*).) "[B]ecause facts considered by the court in selecting the appropriate sentence within the available sentencing range need not be proved beyond a reasonable doubt, a trial court, in this setting, is not prohibited from considering evidence underlying charges of which a defendant has been acquitted." (*Ibid.*) "[T]he *Apprendi* line of decisions does not apply [in such a] context. Both the United States Supreme Court and this court have expressly held that a trial court, in exercising its discretion in sentencing a defendant on an offense of which he or she has been convicted, may take into account the court's own factual findings with regard to the defendant's conduct related to an offense of which the defendant has been acquitted, so long as the trial court properly finds that the evidence establishes such conduct by a preponderance of the evidence." (*In re Coley, supra,* 55 Cal.4th at pp. 557–558 [trial court's reliance on its own view of facts underlying acquitted charge, in exercising its discretion not to strike any of the defendant's prior serious or violent felony convictions, did not violate right to jury trial].)

In *Towne*, the defendant was charged with carjacking, kidnapping, robbery, grand theft of an automobile, making criminal threats, kidnapping to commit carjacking, kidnapping to commit robbery, and joyriding. (*Towne, supra*, 44 Cal.4th at p. 72.) However, the jury acquitted the defendant of all counts except for felony joyriding. (*Id.* at p. 73.) Under the unmodified DSL, the trial court selected the upper term for joyriding

based upon the defendant's lengthy criminal history *and* its conclusion the crime was aggravated because the victim was afraid for his life. (*Id.* at pp. 73–74.) Despite the jury's acquittal of the defendant on all counts involving force or violence, the trial court noted it was convinced, based on the testimony of the victim and other witnesses, that the victim had been terrified. (*Ibid.*)

Our Supreme Court rejected the defendant's claim that his federal constitutional right to jury trial as established in *Apprendi* and its progeny had been violated by the trial court's reliance on "facts that the jury implicitly found not to be true." (*Towne, supra,* 44 Cal.4th at p. 83.) The court explained: "California law affords the trial court broad discretion to consider relevant evidence at sentencing. . . . Nothing in the applicable statute or rules suggests that a trial court must ignore evidence related to the offense of which the defendant was convicted, merely because that evidence did not convince a jury that the defendant was guilty beyond a reasonable doubt of related offenses. [¶] . . . [¶] Nor did the sentencing judge's consideration of conduct underlying acquitted charges violates defendant's Sixth Amendment right to a jury trial. . . . Because in the present case other aggravating factors rendered defendant eligible for the upper term [under the unmodified DSL], the judge's consideration of evidence of conduct underlying counts of which defendant was acquitted, *in selecting the sentence*, did not implicate defendant's constitutional rights to a jury trial or to proof beyond a reasonable doubt. [¶] . . . [¶] Permitting a judge to consider evidence of conduct underlying counts of which the defendant was acquitted does not in any way undermine the jury's role in establishing, by its verdict, the maximum authorized sentence." (*Towne,* at pp. 85–87, italics added & fn. omitted.)

Blackwell contends *Towne* and *In re Coley* are distinguishable, in that they involve "ordinary discretionary sentencing decisions," whereas "the central teaching of [*Graham*] and [*Miller*] is that imposition of [LWOP] on a juvenile offender is not like other sentence choices." Because of such Eighth Amendment constitutional limitations, Blackwell asks us to analogize to death penalty sentencing. However, it is not at all clear how this analogy advances Blackwell's argument.

32

We have already concluded that the jury found all facts required to make Blackwell *eligible* for an LWOP sentence and that the trial court's consideration of the circumstances of the offense, and other *Miller/Gutierrez* factors, in selecting the appropriate sentence does not violate *Apprendi*. Thus, we are untroubled by the trial court's recitation of the evidence Blackwell was the shooter. We are bound to follow our Supreme Court's decision in *Towne*. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

E.      *Abuse of Discretion*

Finally, Blackwell argues the trial court abused its discretion when it selected LWOP, rather than the lesser term of 25 years to life. A court's exercise of discretion will not be disturbed on appeal absent a showing that the court acted in an arbitrary, capricious, or patently absurd way, resulting in a manifest miscarriage of justice. (*People v. Jordan* (1986) 42 Cal.3d 308, 316.) "In reviewing for abuse of discretion, we are guided by two fundamental precepts. First, ' "[t]he burden is on the party attacking the sentence to clearly show that the sentencing decision was irrational or arbitrary. [Citation.] In the absence of such a showing, the trial court is presumed to have acted to achieve legitimate sentencing objectives, and its discretionary determination to impose a particular sentence will not be set aside on review." ' [Citations.] Second, a ' "decision will not be reversed merely because reasonable people might disagree. 'An appellate tribunal is neither authorized nor warranted in substituting its judgment for the judgment of the trial judge.' " ' " (*People v. Carmony* (2004) 33 Cal.4th 367, 376–377.)

Blackwell maintains the trial court abused its discretion by assigning too much weight to the circumstances of the crime, and not enough to the immaturity of the offender. Blackwell urges us to conclude *Miller* established a presumption of immaturity and that 25 years to life is the presumptive sentence. We disagree. *Gutierrez* "[does] not suggest section [190.5(b)] evinces a preference *for* a sentence of 25 years to life." (*People v. Palafox, supra,* 231 Cal.App.4th at p. 91; see *Gutierrez, supra,* 58 Cal.4th at p. 1379.) "No particular factor, relevant to the decision whether to impose LWOP on a juvenile who has committed murder, predominates under the law. Hence, as long as a

33

trial court gives due consideration to an offender's youth and attendant characteristics, as required by *Miller*[, *supra,* 132 S.Ct. 2455], it may, in exercising its discretion under . . . section [190.5(b)], give such weight to the relevant factors as it reasonably determines is appropriate under all the circumstances of the case." (*Palafox*, at p. 73.)

In *People v. Palafox, supra,* 231 Cal.App.4th 68, the defendant and another 16-year-old were convicted of two counts of first degree murder with special circumstances after they committed a burglary and murdered the residents of the home in their beds. (*Id.* at pp. 73–74.) After *Miller*, the juvenile defendant, who was originally sentenced to two consecutive LWOP terms, was resentenced. (*Id.* at pp. 74–75.) At resentencing, the trial court considered psychological evidence of the defendant's immaturity, as well as evidence of a violent and chaotic family background, weighed all the *Miller* factors with no presumption in favor of LWOP, but gave the greatest weight to the circumstances of the offenses. (*Id.* at pp. 75–76, 78–81, 89.)

The reviewing court concluded the trial court had not "exceeded the bounds of reason" in reimposing consecutive LWOP terms. (*People v. Palafox, supra,* 231 Cal.App.4th at p. 91; *id.* at pp. 90–91.) Rather, "[t]he trial court . . . thoughtfully weighed the applicable factors, particularly defendant's youth and its attendant circumstances, and implicitly concluded defendant was unfit ever to reenter society." (*Id.* at p. 91.) The *Palafox* court concluded: "As required by *Miller*, the trial court here 'consider[ed] all relevant evidence bearing on the "distinctive attributes of youth" . . . and how those attributes "diminish the penological justifications for imposing the harshest sentences on juvenile offenders." [Citation.]' [Citation.] It ' "[took] into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." ' [Citation.] The sentence it imposed did not violate the federal or state Constitution." (*Palafox*, at pp. 91–92, quoting *Gutierrez, supra*, 58 Cal.4th at p. 1390.)

Here too, in resentencing Blackwell to LWOP, the trial court explicitly considered all of the relevant *Miller/Gutierrez* factors, with no presumption in favor of LWOP. The trial court was well aware that it had discretion to sentence Blackwell to 25 years to life

34

or LWOP and that the latter sentence should be reserved for the " 'rare juvenile offender whose crime reflects irreparable corruption.' " (*Miller, supra,* 132 S.Ct. at p. 2469.) In selecting LWOP as the appropriate sentence, based primarily on Blackwell's circumstances and the heinous nature of the offense, the trial court did not abuse its discretion.

Just as in *People v. Palafox*, Blackwell was significantly chronologically older than the 14-year-old defendants in *Miller*. In fact, Blackwell was six months shy of his 18th birthday when he committed an offense that showed planning, organization, and callous calculation. The trial court recognized Blackwell's youth, but found "no evidence" he was particularly immature or impetuous. Other than his unsuccessful attempt to shift responsibility to Kellum, Blackwell points to no evidence suggesting the crime was the result of his impulsiveness, a lack of sophistication, peer pressure, or general immaturity. Yet, the evidence is undisputed that Blackwell arranged a ride for himself and Kellum to Carreno's apartment, that they entered unannounced, apparently intending to rob him of drugs and/or money, kicked down his door, and that either he or Kellum shot Carreno, who was laying in bed, several times. Blackwell then attempted to destroy or hide any evidence linking him to the crime. Furthermore, Blackwell had an extensive juvenile record involving weapons and violence, had been provided numerous opportunities within the juvenile system to reform, but his criminal behavior has only escalated. In fact, Carreno's murder was committed less than a month after Blackwell was released from juvenile hall.

We do not foreclose the possibility that in some cases, "the brutality or cold-blooded nature of any particular crime would overpower mitigating arguments based on youth as a matter of course, even where the juvenile offender's objective immaturity, vulnerability, and lack of true depravity should require a sentence less severe than [LWOP]." (*Roper, supra,* 543 U.S. at p. 573; see *id.* at pp. 572–573 [discussing the "unacceptable likelihood" this would occur in death penalty sentencing "despite insufficient culpability"].) This is not such a case. With the exception of evidence of Blackwell's use of methamphetamines around the time of the offense, there was little to

no particularized mitigating evidence before the court. Even if a presumption of immaturity applies, the People rebutted such a presumption in this case.

We are similarly unpersuaded that Blackwell's LWOP sentence is disproportionate to his individual culpability and amounts to cruel and unusual punishment in his particular case.[15]  A sentence in an individual case violates the Eighth Amendment proscription against cruel and unusual punishment only if it is grossly disproportionate to the crime. (*Graham, supra*, 560 U.S. at p. 60.)  "A court must begin by comparing the gravity of the offense and the severity of the sentence. [Citation.]  '[I]n the rare case in which [this] threshold comparison . . . leads to an inference of gross disproportionality' the court should then compare the defendant's sentence with the sentences received by other offenders in the same jurisdiction and with the sentences imposed for the same crime in other jurisdictions." (*Ibid*.)

The sentence in this case, though undoubtedly harsh, does not shock the conscience and is not disproportionate. Blackwell was convicted of first degree murder with special circumstances. First degree special circumstance murder, viewed in the abstract, is perhaps the most serious offense under California law, and the facts of this particular case do not remove it from this category.

LWOP may be "an unconstitutional penalty for . . . juvenile offenders whose crimes reflect the transient immaturity of youth" (*Montgomery, supra*, 136 S.Ct. at p. 734), but the record before us does not compel the conclusion Blackwell falls within that class. Although he was six months short of the age of majority when he committed the

---

[15] Amendments to California's sentencing law provide Blackwell with the opportunity for parole. Subject to exceptions not relevant here, section 1170, subdivision (d)(2) retroactively permits a defendant who was sentenced to LWOP for a crime committed as a juvenile to petition the court for recall and resentencing after serving at least 15 years of that sentence. The possibility of a sentence recall under this provision does not "enter[] into a determination of constitutionality under *Miller*." (*People v. Palafox, supra,* 231 Cal.App.4th at p. 82, fn. 13; accord, *Gutierrez, supra*, 58 Cal.4th at p. 1386.)  "*Miller* repeatedly made clear that the sentencing authority must . . . consider[] how children are different and how those differences counsel against a sentence of [LWOP] '*before* imposing a particular penalty.' " (*Gutierrez,* at p. 1387.)

murder in this case, his criminal history as a juvenile was extensive. In light of his history and the very serious nature of his crime, Blackwell has not demonstrated that his LWOP sentence is disproportionate to his individual culpability. He has not even attempted to argue that it is disproportionate when compared to the sentences of other offenders convicted of the same crime.

Blackwell received a resentencing hearing at which the trial court exercised the individualized sentencing discretion that *Miller* and *Gutierrez* mandate. Imposing LWOP based on the reasons the trial court stated was within its discretion. The trial court did not abuse its discretion or impose cruel and unusual punishment.

## F. *Consideration of CDCR Records*

In his opening brief, Blackwell also argues the sentencing court erred by considering his CDCR records from the time period after his initial sentencing. The argument is unsupported and we reject it.

*Gutierrez* emphasized: "The question is whether [a juvenile offender] can be deemed, *at the time of sentencing*, to be irreparably corrupt, beyond redemption, and thus unfit ever to reenter society, notwithstanding the 'diminished culpability and greater prospects for reform' that ordinarily distinguish juveniles from adults." (*Gutierrez, supra,* 58 Cal.4th at p. 1391, italics added.) In exercising its discretion under *Miller*, "a sentencing court must consider *any* evidence or other information in the record bearing on 'the possibility of rehabilitation.' " (*Id.* at p. 1389, italics added.) "[T]here is nothing in *Miller, Gutierrez*, or *Montgomery* that suggests, much less states, that a trial court is *precluded* from considering evidence of a defendant's postconviction conduct in conducting a resentencing as a remedy for *Miller* error. On the contrary, a trial court is *required* to consider such evidence in determining a defendant's amenability to rehabilitation upon resentencing." (*In re Berg* (2016) 247 Cal.App.4th 418, 440, fn. omitted, review granted July 27, 2016, S235277; *People v. Lozano* (2016) 243 Cal.App.4th 1126, 1137–1138 [addressing admissibility of positive postconviction behavior].)

Blackwell relies on language taken out of context from *Graham*: "Even if the State's judgment that Graham was incorrigible were later corroborated by prison misbehavior or failure to mature, the sentence was still disproportionate because that judgment was made *at the outset*." (*Graham, supra,* 560 U.S. at p. 73, italics added; see *Gutierrez, supra,* 58 Cal.4th at pp. 1386–1387.) Neither *Graham* nor *Gutierrez* were considering whether custodial records could be considered in a resentencing scenario. " ' "It is axiomatic that language in a judicial opinion is to be understood in accordance with the facts and issues before the court. An opinion is not authority for propositions not considered." ' " (*People v. Knoller* (2007) 41 Cal.4th 139, 154–155.)

Here, Blackwell's postconviction behavior was used "at the outset" to assess his prospects for rehabilitation. In any event, the trial court made clear that it would have reached the same conclusion without consideration of Blackwell's CDCR records.

### III.    DISPOSITION

The judgment is affirmed.

_____
BRUINIERS, J.

WE CONCUR:

_____
JONES, P. J.

_____
SIMONS, J.

Superior Court of Sonoma County, No. SCR-511523, Rene A. Chouteau, Judge.

L. Richard Braucher, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Jeffrey M. Laurence, Assistant Attorney General, Joshua A. Klein, Deputy Solicitor General, Laurence K. Sullivan and Seth K. Schalit, Deputy Attorneys General, for Plaintiff and Respondent.