Filed 10/20/22  P. v. Smith CA5

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>KYLIN DION SMITH,<br><br>Defendant and Appellant. | F082127<br><br>(Super. Ct. No. F11906258)<br><br>**OPINION** |

-ooOoo-

### THE COURT\*

APPEAL from a judgment of the Superior Court of Fresno County.  John F. Vogt, Judge.

Deborah L. Hawkins, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and Stephanie A. Mitchell, Deputy Attorneys General, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

\*Before Levy, Acting P. J., Detjen, J. and Peña, J.

## INTRODUCTION

Defendant Kylin Dion Smith was convicted by a jury in 2015 of the first degree murder of Felipe Atilano (Pen. Code, § 187, subd. (a); count 1), the attempted second degree robbery of Atilano (§§ 664, 211; count 2), and the attempted second degree robbery of Isidro Madera (§§ 664, 211; count 4). (Undesignated statutory references are to the Penal Code.) As to count 1, the jury found true an aggravating circumstance alleging the murder was committed during the commission of a robbery (§ 190.2, subd. (a)(17)(A)), and a circumstance alleging defendant was 17 years old at the time of the murder. As to all counts, the jury found true an allegation a principal personally discharged a firearm causing death or great bodily injury (§ 12022.53, subds. (d), (e)(1)). In a bifurcated proceeding, the court found true an allegation that defendant had committed all counts for the benefit of, at the direction of, or in association with, a criminal street gang within the meaning of section 186.22, subdivision (b)(1).

The court sentenced defendant to life without the possibility of parole (LWOP) on count 1, plus a term of 25 years to life for the firearm enhancement. On count 4, the court sentenced defendant to two years six months, with a term of 25 years to life for the firearm enhancement. The court imposed and stayed punishment on count 2 and stayed punishment on the gang enhancements attached to all counts.

In defendant's original appeal, our court concluded the record was ambiguous as to whether the trial court had applied the *Miller v. Alabama* (2012) 567 U.S. 460 (*Miller*) sentencing factors when sentencing defendant to an LWOP term. Our court also concluded defendant's sentences on counts 2 and 4 were unauthorized, section 664 was inapplicable to convictions for second degree robbery, and the court was required to impose a full-term sentence for the stayed sentence in count 2. Finally, we conditionally reversed the judgment and remanded pursuant to Proposition 57, the Public Safety and Rehabilitation Act of 2016.

Thereafter, the juvenile court held a transfer hearing at which the judge ruled defendant was not suitable for juvenile court jurisdiction. Defendant's convictions were reinstated and the matter was returned to the trial judge for resentencing pursuant to the *Miller* factors. A resentencing hearing was held in November 2020, during which the trial judge reimposed the LWOP sentence and declined to strike defendant's firearm enhancements pursuant to Senate Bill No. 620 (2017–2018 Reg. Sess.) (Senate Bill 620). The court also imposed the full middle term sentence of two years plus an additional 25 years to life for the firearm enhancement on both counts 2 and 4, staying the sentence on count 2.[1] The court did not impose a section 1202.45 parole revocation fine in light of defendant's LWOP sentence for the murder conviction.

In this appeal, defendant challenges his LWOP sentence, asserting the court misapplied the factors of *Miller* as well as those of *People v. Gutierrez* (2014) 58 Cal.4th 1354; the sentence is not supported by the record; and his sentence violates his federal right to due process and the Eighth Amendment right to be free of cruel and unusual punishment because he has shown he is capable of rehabilitation.

We modify the judgment to include a parole revocation fine pursuant to section 1202.45 and otherwise affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

*Underlying Facts*

The following statement of facts is a partial excerpt from this court's prior unpublished opinion in *People v. Kylin Dion Smith* (May 4, 2018, F072701):

*"Prosecution's Case*

"**The Murder of Felipe Atilano**

"On October 2, 2011, at around 6:00 a.m., police responded to a single story apartment complex in southwest Fresno commonly referred to

---

[1]The court also imposed and stayed an additional five-year term under section 186.22, subdivision (b)(1) as to each count.

as 'the Brownies.' Upon arrival, police discovered Felipe Atilano lying face down next to a minivan. Atilano had been shot in the head.

"Atilano worked in agriculture outside of Fresno. He had been paid the day before and had immediately cashed his $400 or $450 check. Police observed Atilano's pants pockets had been turned inside out and loose change was scattered around his body. Atilano was transported to the hospital. He died as a result of his injury. An autopsy revealed Atilano had been shot at close range behind his left ear.

"Law enforcement processed the minivan for evidence. A .380–caliber bullet was discovered around the passenger's side of the vehicle. In addition, the van's glove box was open and the owner's manual, vehicle registration, and insurance information were found on the floorboard of the van.

"Detective Andre Benson was assigned to investigate Atilano's murder. Benson had received anonymous phone calls identifying the potential suspects as Walter King and a light-skinned Black male named 'Kyle.' The tip indicated Kyle was from Los Angeles and was involved with a gang called the Hoover Crips. A latent fingerprint lifted from the owner's manual found in the minivan was subsequently matched to defendant.

"**The Shooting of Isidro Madera**

"On the evening of October 14, 2011, 70–year–old Isidro Madera was returning from the Family Food Market near his home in southwest Fresno when he was confronted by a young, light-complected, Black male. The male, a teenager, demanded Madera's wallet. Madera saw six more Black male youths standing nearby. Madera responded '[he] didn't have money,' and stated, 'All I have is sodas.' The teen grabbed the bag and put his foot in front of Madera, attempting to trip him.

"Two additional youths approached and one began kicking Madera. The light-complected male pulled out a handgun and fired nine shots at Madera. Madera was struck multiple times, sustaining injuries to his wrist, groin, and legs. The group fled.

"Madera retreated back to the store to seek help. He was transported to the hospital. Madera survived his injuries but sustained permanent damage affecting the use of his hand and his ability to walk.

4.

"Detective Conrado Martin was assigned to investigate Madera's shooting. Based on reports by responding officers and an anonymous tip, Martin drove to the Summer Hill apartment complex, located just yards away from the Family Food Market. He reviewed security camera footage of the complex recorded the day of the shooting. The footage showed a group of Black teens—defendant, King, Keba Young, Keifer McKinney, Freddie Wilson, and Donte Erby-Bail—walk through the apartment complex, jump a back fence, and begin heading in the direction of the Family Food Market shortly before the shooting.

"Martin was aware of Benson's investigation of Atilano's murder. During the course of the investigation, Martin received information indicating the same parties had been involved in both crimes.

"**Police Questioning**

"On October 27, 2011, Detectives Benson and Martin questioned defendant. When Benson asked about the shooting of Atilano, defendant claimed to have been at his residence not far from the shooting. At about 2:30 a.m., he had left his home to purchase marijuana. While out, defendant ran into his friend, King, and John Luke, a member of the local Strother gang. Defendant told Benson that King asked him to act as a lookout during a 'lick,' which defendant understood to mean a robbery. Defendant agreed.

"The three entered the Brownies apartment complex and observed a male seated behind the wheel of a parked minivan. Defendant saw King open the driver's side door of the van using his sleeve. John Luke pointed a handgun at the man inside, who appeared to be drunk or sleeping. Defendant turned away and heard a pop. When he looked back, he saw John Luke hand the gun to King and then pull the victim onto the ground.

"Defendant approached the victim's body and began checking the victim's pockets. John Luke discovered some money in the victim's front pocket. The group fled the scene. Defendant claimed he did not receive any of the money taken from the victim.

"With respect to the Madera shooting, defendant told detectives he was at the Summer Hill apartment complex 'hanging out' with a group of people, including Zombie, Active, Lil Tonio, Lil Walt (King), Freddie Wilson, Paul, and Tae Tae. The group walked to Anybody's Market to buy 'blunt wraps' and then continued to the Family Food Market. Lil Tonio stated, 'I'm gonna catch a Mexican leaking,' which meant he was going to rob a Mexican individual. Defendant protested the idea.

5.

"When an elderly Mexican man exited the market, Zombie pulled a gun on the man and demanded he 'give it up.' Active tried to hit the man. The victim swung a bag of bottles to defend himself and hit one of the attackers. According to defendant, Zombie raised his gun and fired at the victim multiple times.

"Detectives asked defendant how many times his group had previously robbed a Mexican person. Defendant eventually admitted 'about two or three times.' When detectives told defendant they believed he was lying about his version of events, he agreed. Defendant then claimed Active had approached the victim with a gun. Defendant told detectives he watched the incident while Active, Wilson, and Keba Young participated in the robbery and attack. Defendant remained firm that Active was the shooter.

"Benson and Martin questioned King separately, and then questioned King and defendant jointly. King confirmed everything he had stated in his individual interview had been truthful. Defendant, on the other hand, admitted he made up the name 'John Luke' and that only he and King were present during Atilano's murder. Defendant continued to deny responsibility for the shooting, asserting, 'Point blank … I didn't shoot him.' He insisted King had pulled the trigger. King continued to insist defendant 'did it.'

"Defendant admitted to searching Atilano's pockets following the shooting, and he told detectives he rummaged through the minivan. He maintained he did not take any money from the victim.

"Detective Martin then separately interviewed defendant about the Madera shooting. Defendant told Martin that King had suggested robbing Madera, and defendant had only 'told [Madera] to give it up.' Defendant's cousin, Erby-Bail, swung at Madera and the victim swung back. In response, defendant aimed his handgun at Madera's legs and fired. After the shooting, defendant gave the firearm to Young, who disposed of it.

"When asked how many other times he and his friends had robbed Mexican individuals at that location, defendant told detectives, 'I did it two times.' Defendant apologized for having given detectives 'bullshit this whole time,' explaining he could only expect King to 'man up' about having shot Atilano if he (defendant) 'man[ned] up' to having shot Madera.

6.

"Defendant testified in his own defense at trial. He stated he moved from Texas to Fresno in 2011 to live with his sister. He came to Fresno so he could graduate from high school. Defendant explained King, McKinney, Erby-Bail, and Young were relatives.

"On October 2, 2011, King called defendant and asked if he wanted to 'hit a lick' at a nearby store. Defendant declined. Later that night, King called defendant and stated he 'found another lick' at the Brownies apartment complex. Defendant met King at the Brownies. They attempted to enter an open window of one of the units, but left when they saw someone inside. The two argued about 'trying to get a lick,' until they agreed to find a car to break into.

"While in the parking lot, they came upon a van with music playing inside. A man was sleeping in the driver's seat. Defendant quietly opened the passenger's side door of the vehicle and began rifling through the glove box and shuffling through some papers. He determined there was nothing in the van to steal.

"As defendant was walking around the back of the van, he heard a single gunshot. He saw King pull Atilano from the van and begin rummaging through Atilano's pockets. Defendant asked King what he was doing; King told him to shut up. Defendant took off running.

"On October 14, 2011, just a few weeks later, defendant was hanging out with King, Erby-Bail, Young, Wilson, and McKinney at the Summer Hill apartments. The group went to a nearby market to purchase some blunt wraps. Erby-Bail suggested robbing a Mexican man heading from the store in their direction. As Madera approached, Erby-Bail walked out in front of him and demanded his money. Defendant and Young came around the man's side, and defendant took a swing at him. The man swung his shopping bag in defense. Defendant heard a gunshot, he stepped back and saw Erby-Bail fire six or seven shots at Madera. Defendant denied shooting Madera.

"With respect to his prior statements to the detectives, defendant claimed he told the detectives that a man named 'John Luke' had killed Atilano because he wanted to protect King. However, when defendant realized King was trying to blame him for the murder, he told the detectives the truth.

7.

"As to the shooting of Madera, defendant admitted he had lied about the fact that men named 'Zombie' and 'Active' had shot Madera. He claimed he falsely admitted to the shooting to protect his cousin, Erby-Bail. Defendant felt guilty because he was the person who had encouraged Erby-Bail to move to Fresno. Defendant denied shooting Madera."

### *Relevant procedural history*

In 2015, a jury convicted defendant of first degree murder of Atilano (count 1) and found true a section 12022.53, subdivisions (d) and (e)(1) enhancement and a robbery-murder special circumstance (§ 190.2, subd. (a)(17)(A)) related to that count. The jury also convicted defendant of two counts of attempted second degree robbery (counts 2 and 4 related to Atilano and Madera, respectively) and found true section 12022.53, subdivision (d) and (e)(1) enhancements as to both counts. The trial court also found true section 186.22, subdivision (b)(1) enhancements attached to the murder and attempted robbery counts. The jury acquitted defendant of the attempted murder of Madera (count 3). The court sentenced defendant to LWOP on the murder count plus 25 years to life for the firearm enhancement. The court also sentenced defendant for the attempted robbery of Madera (count 4) to two years six months plus an additional term of 25 years to life for the gun enhancement. The sentences for defendant's attempted robbery conviction related to Atilano (count 2) and the gang enhancements were imposed and stayed. Defendant appealed.

In the first appeal, our court remanded the matter, concluding the record was insufficient to establish the trial court had applied all of the *Miller* sentencing factors when sentencing defendant to an LWOP term. Our court also concluded defendant's sentences on counts 2 and 4 were unauthorized. We held section 664 was inapplicable to convictions for second degree robbery, and the court was required to impose a full-term sentence for the stayed sentence in count 2. Finally, we conditionally reversed the judgment and remanded pursuant to Proposition 57.

8.

*Transfer Hearing*

Upon remand, a juvenile court held a transfer hearing pursuant to Welfare and Institutions Code section 707.  The People submitted a transfer hearing report by the probation department dated September 17, 2018, and the original report by the probation department dated October 29, 2015, and submitted on the facts.  They argued, at the transfer hearing, the court was to "consider the facts as they occurred at the onset," so any conduct subsequent to defendant's conviction was irrelevant to the court's determination.  The court sustained this objection.

The defense submitted a report by Dr. Richard Blak, Ph.D. who also testified as a witness at the hearing.  Dr. Blak reviewed the facts of the case through the probation officer's report and police department reports, read documentation from correctional officers and psychologists in the prison, conducted a mental status evaluation administered by the Wechsler Adult Intelligence Scale to determine defendant's intellectual functioning, and administered the Millon Clinical Multiaxial Inventory to "determine the extent of any psychological disturbance or mental health issues."  Dr. Blak also spoke to defendant's sister and his aunt, who defendant lived with on two different occasions, through whom he "[g]ot some family history and some ideas about [defendant's] developmental issues."  Dr. Blak did not look at the original probation report or review the transcripts of interviews conducted with defendant after the crimes, our court's opinion from defendant's first appeal, defendant's education records, his juvenile records from Texas, or the police reports in the case beyond what was included in the probation officer's transfer report.  Dr. Blak also did not interview any of the codefendants involved in the crimes or review any photos or exhibits from trial regarding defendant's gang history.

He testified defendant was one of six children removed from his mother's custody by child protective services and other court processes.  Defendant's mother was using drugs and "not emotionally responsible" or able to provide defendant with ongoing

nurturing, so defendant did not develop a "secure base." Defendant was sent to live with his aunt in Texas and he did not do very well in school and ran into some behavioral issues. Defendant's life lacked consistency as he moved around a lot. He entered a GED program and started using controlled substances—including alcohol and marijuana and, later, ecstasy and cocaine—to self-medicate. Dr. Blak diagnosed defendant with a "substance use disorder, Ecstasy and cocaine essentially. But he did abuse alcohol and marijuana."

Dr. Blak also diagnosed defendant with antisocial personality disorder and testified deceitfulness, repeated lying, conning others, and a lack of remorse are related diagnostic criteria. He opined antisocial personality disorder has a "chronic course," but it may become less evident or remit by the fourth decade of life. Dr. Blak testified, defendant seeks to be the center of attention and, sometimes, when one seeks attention he takes on a leadership role. He believed defendant was motivated to commit the crime that resulted in the victim's death by defendant's desire to get money to attend the Fresno Fair.

Dr. Blak opined youthful offenders should not be treated the same as adults for purposes of evaluating mental and emotional development. He explained, the brain "is not matured fully until the age of 25." He opined 17-year-eight-month-old defendant was amenable to treatment and programming available in the juvenile court. Dr. Blak believed "at that time [defendant] had the potential for change." He further opined "at the time [defendant] went through the first transfer hearing, … he would be suitable for the program within the juvenile justice system at that time." He explained, while in prison, defendant "made some significant and important kinds of involvement in his education and his programming" that showed he had the capacity to change. He opined the events that transpired may not have happened but for defendant's lack of maturity.

10.

Defendant spoke on his own behalf about his background and discussed the crimes. He explained, on the night of October 2d, he and Walter King met to commit robberies:

> "The crime was very severe, obviously. A man lost his—no, a man didn't lose his life, a man's life was tooken [*sic*] and I did nothing to stop it. I did nothing to help him afterwards either. When my friend told me to check the car after he pulled him out, I checked the car. When he told me to check his pockets, I just didn't feel right about it and I did touch his pockets and I checked his pockets. I didn't remove the things … in his back pocket. I just couldn't understand why he shot the man because he was sleeping in his car. … I thought we would open up the car and probably … beat him up or something. Because that's just what we did, we were looking to make money to support our drug habit. And at 17 years old, starting from age 15, I was addicted to cocaine, Ecstasy pills, prescription drugs, including cough syrup, Xanax pills, and I smoked marijuana and tobacco. And I had a very, very strong drug habit. [¶] … [¶]

> "… And after the night of October 2nd where Mr. Atilano was fatally shot, days later I found myself around the same friend, around my gang-bangers and we were looking to get more money and we seen a man walking out of the store, and one of my friends had pulled out a gun and as we approached, [Mr. Madera] swung his bag at another one of my friends and all I heard was a shot and we all scattered."

Defendant testified, he heard on the news that night that Isidro Madera was 70 years old and he "felt bad" and "spent that night praying." He admitted to lying after he was arrested, stating he lied not just for himself, "but for those friends … who were essentially family," including his cousins and brother's wife's nephew. He testified, he "lied to protect them and they all threw [him] under the bus." Defendant then discussed the sentences his coparticipants received compared to the sentence he received.

He asserted, at the age of 20, his "paragon [*sic*] shifted within somewhere" and he realized he "did everything wrong." He "let a man's life get tooken [*sic*] and didn't stop it." He "didn't reach out for help" and "12 days later, another man got assaulted." He explained his goals including, "to contribute to society positively since I had took [*sic*]

the most valuable thing in society. Though I didn't do it personally, by me letting it happen, I took that man's life also because I didn't stop it."

The court ultimately concluded defendant was not suitable for jurisdiction in a juvenile court. In rendering its decision, the court considered defendant's age at the time of the offenses, 17 years and eight months, and his maturity at that time. The court found defendant "had a very high degree of maturity" at the time of the offenses; "[h]e considered himself and presented himself as a leader." The court also noted defendant's "intellectual capacity is without dispute" and, "[i]n terms of mental and emotional health," there was no evidence defendant "was anything other than fully and adequately functioning." The court discussed defendant's familial history, noting defendant had "significant traumatic losses" in that he did not grow up with his mother or father and he "lost" six siblings who were removed from his mother's custody for general neglect . The court acknowledged defendant spent much of his life with his aunt who was a strong and positive person. From 1998 to 2010, defendant's community and family appeared to be positive, but defendant was in a gang, which was an entirely different kind of community. The court described the circumstances and gravity of the alleged offenses as "horrific" and stated there was "really no way to overstate the circumstances and gravity."

The court explained it was tasked with determining whether defendant, at 17 years and eight months old, could have been rehabilitated prior to the expiration of the juvenile court's jurisdiction when he turned 25. It concluded defendant was not suitable for jurisdiction in a juvenile court and the matter must be transferred to a court of criminal jurisdiction where defendant would be prosecuted under the general laws of the State of California.

### *Resentencing Hearing*

Following the transfer hearing, the trial court held a new sentencing hearing on November 19, 2020. The parties agreed to submit the record of proceedings from the

12.

juvenile court for the trial court's consideration, particularly with regard to the *Miller* analysis. The trial court reviewed the original November 2015 report and recommendation of the probation department, the transcript of proceedings and records from the juvenile court transfer proceedings, and the contents of the 2015 trial file. The court permitted defendant to speak on his own behalf. Defendant stated:

> "It's been nine years now. When I first caught these cases, when these offenses first happened, I was 17 years old. I was a kid, you know, with no type of guidance. I was only led by my will to be a gang member, and I committed those crimes. Ever since then I've been working on bettering myself, even with the life without parole sentence that you gave me.

> "I went to prison and focused on bettering myself. I completed high school. I began college, which I was close to completing. I started to be a mentor to other people on the yard in the prisons that I was at showing them that just because you're in here doesn't mean that you have to stay the way that you were, you know. And the thing that drove me to that is I spent a lot of time just locked in a cell with my own thoughts and I used to think about the things that I did when I was younger. I did a lot wrong. I did a lot of wrong and I didn't want to be remembered for that. I hurt a lot of people, and for that I would like to apologize. And I know saying sorry isn't going to … help anything, so I decided to try to better myself and try to better those around me because the negative impact that I had on my community out there I decided to have a positive impact on others that were going to go home hoping that they would take the knowledge and stuff that I gave them out there."

Defendant apologized to those he hurt and reported that he had taken and taught classes on victim impact, family development, and "[e]lements of [c]hange," which are "all requirements to go to the parole board." He asserted these classes taught him "to connect the dots of why [he] was doing the things that [he] did, why [he] became that person that [he] became at 17." He stated, there was "no excuse for it, but it was just a lot of pain that [he] didn't understand how to really define at that time. [He] felt … let down and angry at everyone and … didn't care." He asserted the programming classes

13.

taught him how to become a better person. He was studying to get degrees in psychology and political science.

Defense counsel argued defendant had "shown he can be rehabilitated" and "that shows that he is not that type of rare juvenile offender who shows irreparable corruption." He asserted, the crimes were not "well thought-out or well-planned crimes."

The prosecutor emphasized the permanent and lasting effects of defendant's crimes. He stated he "applaud[ed] the defendant and the work that he's done since." But he argued for the reimposition of the life without parole sentence based on "[t]he magnitude, … the repetitive nature, and the absolute callousness" of the crimes which, he asserted, showed "there was an absolute disregard for anyone else, but himself." He asserted, "the defendant's conduct leading up to, including, and through the duration of these two crimes, which were spread out by two weeks, his path from when he left Texas to when he came to California showed a complete and utter disregard for any care, any empathy for any others." The prosecutor argued, "To say these crimes were not planned out is to belie the facts that this court heard through the testimony of those cases. To say that the defendant was not a leadership role of those [*sic*] belies those facts and the very finding that this court made at the time of the original sentencing." The prosecutor noted Dr. Blak explained deceitfulness, repeated lying, conning others, and lack of remorse were symptoms of antisocial personality disorder that were chronic and would become less evident "by about the fourth decade of life."

The court resentenced defendant to life without the possibility of parole. It detailed its considerations in rendering the sentence. The court acknowledged *Miller* required it to consider factors unique to juvenile offenders before imposing a life without the possibility of parole sentence and, pursuant to *People v. Gutierrez, supra*, 58 Cal.4th 1354, it was required to determine whether a particular defendant is "a rare, juvenile offender whose crime reflects irreparable corruption."

14.

Before rendering its decision, the court first discussed defendant's age at the time of the crimes, and the impact of his age on his culpability. The court noted defendant was 17 years and eight months old at the time of the attempted robbery and murder of Atilano and the subsequent attempted robbery of Madera; so, defendant was "just a few months short of being a legal adult." The court stated the evidence at trial and the transfer hearing reflected defendant "was already a self-confident, self-reliant, street smart, rule defying young man. His status as the leader of the pack in the two present crimes validate his own self descriptions as a gang leader, and his leadership roles in the present crimes cannot be denied."

Next, the court considered defendant's family and social circumstances, including environmental vulnerabilities, such as childhood history, abuse or neglect, familial substance abuse issues, lack of adequate parenting or education, prior exposure to violence, and susceptibility to psychological damage or emotional disturbance. The court acknowledged, based on the evidence presented at the transfer hearing, defendant was one of six children who were all removed from the mother's custody by child protective services or other court processes, and defendant never knew his biological father. Defendant was primarily raised by his maternal aunt from the ages of four to 16 (from 1998 to 2010) and she provided a "very stable household with positive social experiences," including exposure to male role models through church and organized sports and community activities. There was no record of drug or alcohol abuse in defendant's home setting nor a record of family violence; rather, "in these eight [*sic*] formative years, the defendant had a relatively stable home and family environment." Records established defendant was "intellectually gifted" and he "excelled athletically, specifically at football." While in his aunt's home, defendant was a respectful and responsible family member. "But outside of the home he took an increasingly negative trajectory, losing privileges to participate in activities, fighting, threatening others, and

15.

eventually leading to expulsion from high school and placement in the Texas juvenile justice system." Defendant "threatened correctional officers" and their families.

The court then turned to the circumstances of the offenses, beginning with Atilano's murder. The court noted, in part, when questioned, defendant expressed some remorse about the death, but then repeatedly lied to police, first blaming a fictional character then pointing a finger at his coparticipant King. The court stated, with regard to Atilano's killing, "the cowardness and calculated, cold-blooded display" could not be denied. It stated, the "interviews of the defendant and codefendant King leave no doubt that the defendant was the dominant predator and the ransacking of [Atilano's] person and vehicle show a total disrespect of human dignity in this crime." With regard to the attempted robbery and shooting of Madera, the court stated it had "no doubt" defendant had a "position of leadership and dominance over the other gang members." The court initially stated there was no indication substance abuse played a role in the offenses, but then stated the evidence was inconsistent regarding defendant's substance abuse.

It next concluded there was no evidence to demonstrate defendant's age played a role in his ability to deal with law enforcement or assist in his defense. "To the contrary, [defendant] had plenty of experience with law enforcement given his multiple adjudications back in Texas."[2] The court noted defendant's expert testified there was no evidence of injuries to defendant's brain or that he had a medical condition that affected his brain. Rather, the "extensive interviews" with defendant made clear to the court "defendant was quite capable of manipulating facts and words, both as to the codefendant and as to the investigative officers."

Finally, with regard to "the possibility of rehabilitation," the court noted defendant had gone through programs with the Department of Corrections and Rehabilitation,

---

[2]The 2015 probation report reflects defendant faced multiple charges in Texas in 2009, including "Terroristic Threat Against Public Safety."

16.

furthered his education, had no violations of administrative procedures, and no discipline issues while housed at the Fresno County jail pending the review hearings. Based on defendant's representations, defendant had completed his GED and was pursuing a college degree. The court stated:

> "[S]uch a record might support a finding that the defendant is capable of rehabilitation in a custodial setting. There is no real question that he could intellectually adapt to such process. But in reviewing the defendant's testimony at the transfer hearing, the defendant displays a continued refusal to take responsibility for his actions, his role in the violent offenses, the failure to take any steps to accept responsibility, blaming others, and substantially denying drug abuse, even excusing his systematic lying about the crimes."

The court asserted defendant "still acts like these crimes were something that happened, not something that he did. He spent a good deal of time worrying about what [the] codefendants were getting for things that he is being held responsible for at a very high level."

The court noted it was required to consider the distinctive attributes of youth in accordance with *Miller* and in the context of the Eighth Amendment that was also codified in sections 190.5 and 190.3. It held, "a thorough consideration of these principles" compelled it to find "defendant is distinguished and far removed from the chronological fact of his age when he committed these most violent crimes." With regard to whether defendant was capable of rehabilitation, the court stated its belief "that while the defendant has shown an ability to adapt to his institutional setting, that it doesn't address potential dangers, which are really the issue of rehabilitation, that is the potential dangers to society and the future." The court stated, "Rehabilitation doesn't relate to institutionalized behavioral patterns. It relates to potential dangers and likely dangers that the defendant could again impose on the community at large." The court stated it could not find defendant was "capable in a probability [*sic*] of ultimate rehabilitation for

the safety of the community." The court also declined to strike defendant's firearm enhancements.

## DISCUSSION

Defendant challenges the court's imposition of a life without the possibility of parole sentence, asserting the court erred in considering the relevant factors. He also contends his sentence violates the Eighth Amendment as cruel and unusual punishment. We reject defendant's arguments and affirm the judgment. We also agree with the parties the court erred in failing to impose a parole revocation fine.

## I. The Court Did Not Err in Sentencing Defendant to Life Without the Possibility of Parole

Defendant argues the court erred in considering the requisite factors before sentencing him to life without the possibility of parole.

### A. Standard of Review

#### 1. Sentencing Decisions

We review the trial court's sentencing decision for abuse of discretion. (*People v. Sandoval* (2007) 41 Cal.4th 825, 847.) The party challenging the sentence bears the burden of "'"clearly show[ing] that the sentencing decision was irrational or arbitrary. [Citation.] In the absence of such a showing, the trial court is presumed to have acted to achieve legitimate sentencing objectives, and its discretionary determination to impose a particular sentence will not be set aside on review."'" (*People v. Carmony* (2004) 33 Cal.4th 367, 376–377 (*Carmony*); accord, *People v. Lee* (2017) 16 Cal.App.5th 861, 866.) "[A] trial court will abuse its discretion … if it relies upon circumstances that are not relevant to the decision or that otherwise constitute an improper basis for decision. [Citations.]" (*People v. Sandoval*, *supra*, at p. 847.)

"[A] '"decision will not be reversed merely because reasonable people might disagree. 'An appellate tribunal is neither authorized nor warranted in substituting its judgment for the judgment of the trial judge.'"'" (*Carmony*, *supra*, 33 Cal.4th at p. 377.)

18.

"Taken together, these precepts establish that a trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it." (*Carmony*, at p. 377.)

The trial court's factual findings upon which it bases its discretionary determinations are subject to review under the substantial evidence standard. (See *People v. Cluff* (2001) 87 Cal.App.4th 991, 998 [court abuses discretion when factual findings critical to decision find no support in evidence]; accord, *People v. Buford* (2016) 4 Cal.App.5th 886, 901 [facts upon which court's finding of unreasonable risk is based are subject to review for substantial evidence].) "'[A] trial court will abuse its discretion … if it relies upon circumstances that are not relevant to the decision or that otherwise constitute an improper basis for decision.'" (*People v. Hicks* (2017) 17 Cal.App.5th 496, 512.)

### 2. *Eighth Amendment Claims*

The Eighth Amendment to the United States Constitution applies to the states. (*People v. Caballero* (2012) 55 Cal.4th 262, 265, fn. 1.) It prohibits the infliction of "cruel and unusual" punishment. (U.S. Const., 8th Amend.) The touchstone is gross disproportionality. (See *Ewing v. California* (2003) 538 U.S. 11, 21–24 (lead opn. of O'Connor, J.); *People v. Cage* (2015) 62 Cal.4th 256, 294.) "'''''To determine whether a sentence is cruel or unusual as applied to a particular defendant, a reviewing court must examine the circumstances of the offense, including its motive, the extent of the defendant's involvement in the crime, the manner in which the crime was committed, and the consequences of the defendant's acts. The court must also consider the personal characteristics of the defendant, including age, prior criminality, and mental capabilities. [Citation.] If the court concludes that the penalty imposed is 'grossly disproportionate to the defendant's individual culpability' [citation], or, stated another way, that the punishment "'''shocks the conscience and offends fundamental notions of human

dignity'"'" [citation], the court must invalidate the sentence as unconstitutional."
[Citation.]'"'"" (*People v. Cage*, *supra*, at p. 294.)

### B.    Applicable Law

The United States Supreme Court has recognized "children are constitutionally different from adults for purposes of sentencing." (*Miller*, *supra*, 567 U.S. at p. 471.)  In *Roper v. Simmons* (2005) 543 U.S. 551 (*Roper*), the United States Supreme Court held the Eighth Amendment forbids imposition of the death penalty on juvenile offenders under 18 years of age.  (*Roper*, *supra*, at p. 568.)  The *Roper* court stated, "Three general differences between juveniles under 18 and adults demonstrate that juvenile offenders cannot with reliability be classified among the worst offenders.  First, as any parent knows and as the scientific and sociological studies … tend to confirm, '[a] lack of maturity and an underdeveloped sense of responsibility are found in youth more often than in adults ….  These qualities often result in impetuous and ill-considered actions and decisions.' [Citations.]" (*Id.* at p. 569.)  Second, "juveniles are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure." (*Ibid.*)  Third, "the character of a juvenile is not as well formed as that of an adult.  The personality traits of juveniles are more transitory, less fixed.  [Citation.]" (*Id.* at p. 570.)  Thus,

> "[t]he susceptibility of juveniles to immature and irresponsible behavior means 'their irresponsible conduct is not as morally reprehensible as that of an adult.' [Citation.]  … Indeed, '[t]he relevance of youth as a mitigating factor derives from the fact that the signature qualities of youth are transient; as individuals mature, the impetuousness and recklessness that may dominate in younger years can subside.' [Citations.]" (*Ibid.*)

Because of juveniles' "diminished culpability," the court found, the penological justifications for the death penalty—retribution and deterrence—apply to them with less force than to adults. (*Roper*, *supra*, 543 U.S. at p. 571.)  The *Roper* court adopted a categorical rule barring imposition of the death penalty on anyone under the age of 18,

rather than permitting consideration of mitigating arguments related to youth on a case-by-case basis. (*Id.* at pp. 572–573.)

Five years later, in *Graham v. Florida* (2010) 560 U.S. 48 (*Graham*), the United States Supreme Court relied heavily on *Roper* to hold: "The Constitution prohibits the imposition of a life without parole sentence on a juvenile offender who did not commit homicide. A State need not guarantee the offender eventual release, but if it imposes a sentence of life it must provide him or her with some realistic opportunity to obtain release before the end of that term." (*Graham*, *supra*, at p. 82.) The court observed LWOP "is 'the second most severe penalty permitted by law'" (*id.* at p. 69), and "an especially harsh punishment for a juvenile" (*id.* at p. 70).

Two years after *Graham*, the United States Supreme Court decided *Miller*, *supra*, 567 U.S. 460, in which it held "*mandatory* life without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on 'cruel and unusual punishments.'" (*Id.* at p. 465, italics added.) The *Miller* court concluded "[s]uch a scheme prevents those meting out punishment from considering a juvenile's 'lessened culpability' and greater 'capacity for change,' [citation]," and runs afoul of the requirement in the high court's cases of "individualized sentencing for defendants facing the most serious penalties." (*Ibid.*)

*Miller* reiterated many of the findings of *Graham* and *Roper* with respect to children's "distinctive (and transitory) mental traits and environmental vulnerabilities." (*Miller*, *supra*, 567 U.S. at p. 473; see *id.* at pp. 471–474.) The court stated: "By removing youth from the balance—by subjecting a juvenile to the same life-without-parole sentence applicable to an adult—[mandatory penalty schemes] prohibit a sentencing authority from assessing whether the law's harshest term of imprisonment proportionately punishes a juvenile offender. That contravenes *Graham*'s (and also *Roper*'s) foundational principle: that imposition of a State's most severe penalties on juvenile offenders cannot proceed as though they were not children." (*Id.* at p. 474.) The

21.

high court required "that a sentencer have the ability to consider the 'mitigating qualities of youth,'" which, it observed, "'is more than a chronological fact.' [Citation.] It is a time of immaturity, irresponsibility, 'impetuousness[,] and recklessness.' [Citation.] It is a moment and 'condition of life when a person may be most susceptible to influence and to psychological damage.' [Citation.] And its 'signature qualities' are all 'transient.' [Citation.]" (*Miller*, *supra*, at p. 476.)

Accordingly, the *Miller* court held:

"[T]he Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders. [Citation.] By making youth (and all that accompanies it) irrelevant to imposition of that harshest prison sentence, such a scheme poses too great a risk of disproportionate punishment.… [G]iven all we have said in *Roper*, *Graham*, and this decision about children's diminished culpability and heightened capacity for change, we think appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon. That is especially so because of the great difficulty we noted in *Roper* and *Graham* of distinguishing at this early age between 'the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption.' [Citations.] Although we do not foreclose a sentencer's ability to make that judgment in homicide cases, we require it to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." (*Miller*, *supra*, 567 U.S. at pp. 479–480.)

The court reiterated: "Our decision does not categorically bar a penalty for a class of offenders or type of crime—as, for example, we did in *Roper* or *Graham*. Instead, it mandates only that a sentencer follow a certain process—considering an offender's youth and attendant characteristics—before imposing a particular penalty." (*Miller*, *supra*, 567 U.S. at p. 483.)

Thereafter, in *Montgomery v. Louisiana* (2016) 577 U.S. 190 (*Montgomery*), the United States Supreme Court held *Miller* "announced a substantive rule of constitutional law" and, thus, was retroactive. (*Id*. at pp. 208–209.) The *Montgomery* court clarified the analysis that must precede a sentence of life without the possibility of parole for a

22.

juvenile defendant, noting "*Miller*'s holding has a procedural component" in that it "requires a sentencer to consider a juvenile offender's youth and attendant characteristics before determining that life without parole is a proportionate sentence." (*Id*. at pp. 209–210.) The *Montgomery* court explained, requiring "[a] hearing where 'youth and its attendant characteristics' are considered as sentencing factors is necessary to separate those juveniles who may be sentenced to life without parole from those who may not" "gives effect to *Miller*'s substantive holding that life without parole is an excessive sentence for children whose crimes reflect transient immaturity." (*Id*. at p. 210.)

California's statutory scheme has long afforded trial courts sentencing discretion where defendants who were tried as adults were 16 or 17 years old when they committed murder. Subdivision (b) of section 190.5 provides: "The penalty for a defendant found guilty of murder in the first degree, in any case in which one or more special circumstances … has been found to be true …, who was 16 years of age or older and under the age of 18 years at the time of the commission of the crime, shall be confinement in the state prison for life without the possibility of parole or, at the discretion of the court, 25 years to life."

In *People v. Gutierrez, supra*, 58 Cal.4th 1354, the California Supreme Court held that sentences for 16- or 17-year-old juveniles who commit special circumstance murder must be selected without a presumption in favor of LWOP. (*Id*. at p. 1387.) The *Gutierrez* court further stated, properly construed so as not to impose a presumption in favor of LWOP, "the sentencing regime created by section 190.5[, subdivision](b) authorizes and indeed requires consideration of the distinctive attributes of youth highlighted in *Miller* …." (*People v. Gutierrez, supra*, at p. 1361.) Accordingly, the statute "confers discretion on a trial court to sentence a 16- or 17-year-old juvenile convicted of special circumstance murder to life without parole or to 25 years to life." (*Id.* at p. 1360.) In exercising that discretion, "the trial court must consider all relevant evidence bearing on the 'distinctive attributes of youth' discussed in *Miller* and how

23.

those attributes 'diminish the penological justifications for imposing the harshest sentences on juvenile offenders.' [Citation.]" (*Id.* at p. 1390.)

The *Gutierrez* court further explained *Miller* requires a sentencer to determine "whether a particular defendant is a '"rare juvenile offender whose crime reflects irreparable corruption."'" (*People v. Gutierrez, supra*, 58 Cal.4th at p. 1388; see *Miller, supra*, 567 U.S. at pp. 479–480.) Specifically, the *Gutierrez* court interpreted *Miller* to require a sentencing court to admit and consider relevant evidence or other information in the record of: first, "a juvenile offender's 'chronological age and its hallmark features— among them, immaturity, impetuosity, and failure to appreciate risks and consequences'"; second, "'the family and home environment that surrounds [the juvenile]—and from which he cannot usually extricate himself—no matter how brutal or dysfunctional'"; third, "'the circumstances of the homicide offense, including the extent of [the juvenile defendant's] participation in the conduct and the way familial and peer pressures may have affected him'"; fourth, "whether the offender 'might have been charged and convicted of a lesser offense if not for incompetencies associated with youth—for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys'"; and finally, fifth, "'the possibility of rehabilitation.'" (*Gutierrez*, at pp. 1388–1389, quoting *Miller, supra*, 567 U.S. at pp. 477–478.)

Notably, the United States Supreme Court recently clarified in *Jones v. Mississippi* (2021) __ U.S. __ [141 S.Ct. 1307] that under *Miller* and *Montgomery*, in imposing a sentence of life without the possibility of parole, the sentencing court is not required to make a separate factual finding that the offender is "permanently incorrigible," nor is the court required to provide an on-the-record sentencing explanation with an implicit finding of the offender's permanent incorrigibility. (*Jones, supra*, at pp. __ [141 S.Ct. at pp. 1311, 1313, 1318–1319, 1321].) Instead, "[i]n a case involving an individual who was under 18 when he or she committed a homicide, a State's discretionary sentencing

24.

system is both constitutionally necessary and constitutionally sufficient." (*Id.* at p. __ [141 S.Ct. at p. 1313].)

### C.     Analysis

In arguing the court erred in sentencing him to life without the possibility of parole, defendant asserts the trial court did not sufficiently consider the requisite factors under *Miller* and *Gutierrez* and improperly considered other factors. He further argues some of the court's factual findings were not supported by the record, and his LWOP sentence violates the Eighth Amendment. We reject each of these contentions in turn.

#### 1.     *The court did not err in applying the Miller-Gutierrez factors*

In his first two issues, defendant contends the court erred in analyzing whether he was capable of rehabilitation. He first asserts the court erred in considering his "current dangerousness" at sentencing. He contends that inquiry is a relevant consideration for granting parole but, under *Gutierrez*, the court should have considered whether he "could be deemed *at the time of sentencing* to be capable of rehabilitation." Defendant also argues the court erred in disregarding the rehabilitative efforts he had taken while incarcerated. He asserts the court found "that [he] had shown himself capable of rehabilitation during his nine years in prison," but it then ignored this finding. In support, defendant relies upon the court's statement: "Now, such a record might support a finding that defendant is capable of rehabilitation *in a custodial setting*. There is no real question that he could intellectually adapt to such a process." (Italics added.) He asserts the court's statement reflects it "negated" his "rehabilitation accomplishments" by qualifying that they occurred in a custodial setting; but this was the only setting in which he could make rehabilitative efforts because he is incarcerated. He argues the court erroneously found, "Rehabilitation doesn't relate to institutionalized behavioral patterns."

In *Graham*, *supra*, 560 U.S. 48, the United States Supreme Court discussed the goals of criminal punishment—retribution, deterrence, incapacitation, and

rehabilitation— in concluding life without parole for juvenile *nonhomicide* offenders lacked penological justification and was, by its nature, disproportionate to the offense. (*Id*. at p. 71, italics added.) The *Graham* court explained, "Recidivism is a serious risk to public safety, and so incapacitation is an important goal." (*Id*. at p. 72.) "To justify life without parole on the assumption that the juvenile offender forever will be a danger to society requires the sentencer to make a judgment that the juvenile is incorrigible." (*Id*. at p. 73.) In *Gutierrez*, the California Supreme Court held, "the trial court must consider all relevant evidence bearing on the 'distinctive attributes of youth' discussed in *Miller* and *how those attributes 'diminish the penological justifications for imposing the harshest sentences on juvenile offenders*.' [Citation.]" (*People v. Gutierrez*, *supra*, 58 Cal.4th at p. 1390, italics added.)

Here, in accordance with *Gutierrez*, the court was tasked with considering the appropriate factors to determine whether an LWOP sentence was justified, including, in part, the need to incapacitate defendant. Accordingly, we cannot conclude, as defendant contends, the court "legally erred" in considering the danger defendant poses to society. Rather, the record reflects the court reviewed and considered evidence of defendant's postconviction efforts coupled with the other "relevant evidence bearing on the 'distinctive attributes of youth,'" and weighed them against the penological justifications for an LWOP sentence, including the need for incapacitation based on the danger defendant presents to society. Thus, its analysis followed the guidelines set forth in *Gutierrez*.

We also cannot conclude, as defendant argues, the court "disregarded" his rehabilitative efforts because they occurred while he was in prison. Here, the court stated a "thorough consideration of [the *Miller* factors, the Eighth Amendment, and the aggravating and mitigating factors codified in sections 190.5 and 190.3] compel[led it] to find the defendant is distinguished and far removed from the chronological fact of his age when he committed these most violent crimes." In so finding, the court considered

26.

whether defendant was capable of rehabilitation. The court stated, "[T]hat while the defendant has shown an ability to adapt to his institutional setting, that it doesn't address potential dangers, which are really the issue of rehabilitation, that is the potential dangers to society and the future." The court continued, "Rehabilitation doesn't relate to institutionalized behavioral patterns. It relates to potential dangers and likely dangers that the defendant could again impose on the community at large, therefore, I'm not inclined at this time to find that the defendant is capable … of ultimate rehabilitation for the safety of the community."

We reject defendant's contention the court's statements establish it ignored evidence of defendant's postconviction conduct because it occurred while he was in custody. Rather, in context, we read the court's statements as evidence it considered if and how evidence of defendant's postconviction efforts while incarcerated diminished the penological justifications for imposing an LWOP sentence, including the need for incapacitation. (See *People v. Gutierrez*, *supra*, 58 Cal.4th at p. 1390; accord, *Miller*, *supra*, 567 U.S. at p. 472.) Ultimately, the court found an LWOP sentence was justified in spite of evidence of defendant's positive postconviction conduct. And, as discussed further *post*, we cannot conclude the court abused its discretion in imposing this sentence.

### 2. *The court did not abuse its discretion in imposing the sentence*

Defendant challenges the court's imposition of an LWOP sentence, asserting his statements at the transfer hearing demonstrated "immaturity, impetuosity, and failure to appreciate risks and consequences" of youth played a significant role in the instant offense. He argues the record does not support the court's findings that he "continued to refuse to take responsibility for his actions" and blamed others, "tried to justify lying," and he "substantially denied drug abuse." He further asserts "the trial court's view of [him], after nine years in prison, as a lying cold-blooded, youthful killer who would always pose a danger to society is not supported by the record." Rather, he argues the

27.

record "amply demonstrates that [he] has shown himself capable of rehabilitation," though "he is not fully rehabilitated." He contends his LWOP sentence was "presumptively unlawful" because the court did not follow the *Miller-Gutierrez* procedures in sentencing him. We cannot conclude the court abused its broad discretion in sentencing defendant to life without parole after considering the *Miller* factors and evidence presented.

First, the record reflects the court expressly considered each of the factors the *Miller* court deemed relevant to a sentencer's determination of whether a particular defendant is a "'rare juvenile offender whose crime reflects irreparable corruption.'" (*Miller*, *supra*, 567 U.S. at pp. 479–480; see *People v. Gutierrez*, *supra*, 58 Cal.4th at p. 1388.) Indeed, the court discussed the evidence related to each factor and the conclusions it made therefrom. Specifically, the court acknowledged and considered defendant's postconviction conduct but concluded, in light of the other evidence, including the circumstances of the violent offenses and defendant's role in them, the fact he was months short of being a legal adult when the crimes were committed, and evidence of defendant's criminal history and youth, a life without parole sentence was justified. It reasoned, in part, that defendant took on a leadership role with regard to the crimes and that he was "distinguished and far removed from the chronological fact of his age when he committed these most violent crimes."[3] With regard to the killing of Atilano, the

---

[3]We reject defendant's contention the court improperly considered that he was a leader in the commission of the crimes in violation of his due process rights. In *Apprendi v. New Jersey* (2000) 530 U.S. 466, the United States Supreme Court held, other than the fact of a prior conviction, a fact that increases the penalty for a crime beyond a prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt. (*Id*. at p. 490.) However, the *Apprendi* court reiterated, nothing "suggests that it is impermissible for judges to exercise discretion—taking into consideration various factors relating both to offense and offender—in imposing a judgment *within the range* prescribed by statute." (*Id*. at p. 481.) Here, LWOP was the maximum statutory sentence the court could impose and its consideration of the *Miller-Gutierrez* factors related to the offenses and offender in exercising its discretion to impose sentence within a prescribed range did not violate *Apprendi*. (See *People v. Blackwell* (2016) 3 Cal.App.5th 166, 188; see generally *People v. Snow* (2003) 30 Cal.4th 43, 126, fn. 32 [in

court stated "the cowardness and calculated, cold-blooded display" could not be denied, noting Atilano "was asleep or meditating alone in his vehicle unsuspecting and entirely vulnerable and defenseless." The court described defendant as "the dominant predator," and it concluded "the ransacking of the victim's person and vehicle show a total disrespect of human dignity in this crime."

Defendant has not established that no reasonable person could agree with the trial court's sentencing decision. (See *Carmony*, *supra*, 33 Cal.4th at p. 377 ["[A] trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it"].) That is, in light of the record before us, even if reasonable people might disagree with the trial court's ultimate sentencing decision, we cannot conclude it was irrational or arbitrary. (See *ibid*.) And we are not authorized to reweigh the evidence or to substitute our judgment for the judgment of the trial judge. (See *id*. at p. 374.) To the extent defendant is arguing the court should have disregarded the other *Miller* factors in light of his postconviction conduct, that is not what *Miller* or *Gutierrez* requires, nor does the court's failure to do so amount to an abuse of discretion. (See *People v. Blackwell*, *supra*, 3 Cal.App.5th at p. 200 ["'No particular factor, relevant to the decision whether to impose LWOP on a juvenile who has committed murder, predominates under the law'"].)

In so concluding, we further note the record supports the trial court's findings that defendant continued to refuse to take responsibility for his role in the crimes and tried to justify lying after the offenses. First, at the resentencing hearing, defendant stated it had been nine years since he "first caught these cases, when these offenses first happened." Based on this statement, the court reasonably stated defendant acted as though these crimes are something that "happened" to him, as opposed to something he did. It

---

deciding whether to sentence a defendant to death or LWOP, "facts which bear upon, but do not necessarily determine, which of these two alternative penalties is appropriate do not come within the holding of *Apprendi*"].)

29.

reasonably inferred from these statements that defendant continued to refuse to take responsibility for his role in the crimes.  Additionally, at the transfer hearing, in discussing the crimes, defendant explained someone's life got taken and he did nothing to stop it.  Again, the court could have reasonably interpreted this statement as defendant describing his involvement in the crimes as passive, rather than admitting to the active role he took in them.  Also at the transfer hearing, defendant admitted to lying after he was arrested, stating he lied not just for himself, "but for those friends … who were essentially family," including his cousins and brother's wife's nephew.  He testified, he "lied to protect them and they all threw [him] under the bus."  Defendant then discussed the sentences his coparticipants received compared to the sentence he received.  Viewing such evidence in the light most favorable to the court's findings, we conclude the court could have reasonably interpreted defendant's statements as efforts to rationalize his deceptive behavior rather than to take responsibility for it.

Defendant also challenges the court's statement that the evidence of defendant's substance abuse history was "inconsistent" in that defendant reported much more pervasive usage and the use of more substances at the transfer hearing than he originally reported to the probation department.  However, we conclude the record comports with the trial court's statement.

The original probation report filed in November 2015 reflects, in part, that defendant used prescription Xanax and cough syrup two times a week from the age of 13 to the age of 16; he last used them on his 17th birthday, which was months before his arrest.  The original probation report also states defendant began using alcohol at the age of 13 and used it occasionally, including the week before his arrest, and he used marijuana and cocaine daily and last used them on the day of his arrest.  It also reflects defendant used Ecstasy one to two times a week starting at the age of 15, and he last used it a week before his arrest.  At the transfer hearing, defendant reported he had a "very, very strong drug habit" and was "living to get more money to get high."  He reported, at

30.

the age of 17, he smoked marijuana and tobacco and he was addicted to cocaine, Ecstasy pills, prescription drugs, including cough syrup, and Xanax pills. Defendant's statement was in contrast with his previous report to the probation department that he had not used prescription Xanax and cough syrup since his 17th birthday, and he used them regularly between the ages of 13 and 16, rather than when he was 17. Thus, the record supports the trial court's assessment of defendant's statements.

Accordingly, on this record, we conclude sufficient evidence supports the trial court's findings and the court did not abuse its discretion in sentencing defendant to LWOP.

### 3. *Defendant's sentence does not violate the Eighth Amendment*

Defendant also contends, because he has "shown himself capable of rehabilitation," his LWOP sentence violates his federal Eighth Amendment right to be free of cruel and unusual punishment. The People respond defendant's Eighth Amendment claim "is moot because he is statutorily eligible for a youth offender parole hearing during his 25th year of incarceration." As discussed, we reject defendant's contention the court abused its discretion in imposing an LWOP sentence after weighing the applicable factors. We also reject as moot defendant's contention his sentence violates the Eighth Amendment in light of his eligibility for parole.

In 2013, the California Legislature added section 3051, which established a youth offender parole hearing procedure "for the purpose of reviewing the parole suitability of any prisoner who was under 18 years of age at the time of his or her controlling offense." (Former § 3051, subd. (a)(1); Stats. 2013, ch. 312, § 4.) As originally enacted, juveniles sentenced to LWOP were not eligible for youth offender parole hearings. (*Id.*, subd. (h).) However, in September 2017, the Legislature passed Senate Bill No. 394 (2017–2018 Reg. Sess.), which was approved by the Governor and filed by the Secretary of State in October 2017. (Stats. 2017, ch. 684, § 1.5.) The bill was intended to bring California

law in compliance with the constitutional requirements of *Miller* and *Montgomery v. Louisiana* by applying the youth offender parole process to juveniles sentenced to LWOP. (Sen. Com. on Public Safety, Analysis of Sen. Bill No. 394 (2017-2018 Reg. Sess.) Mar. 21, 2017, p. 4.) The law added subdivision (b)(4) to section 3051, which provides parole eligibility to persons convicted of a controlling offense committed before they were 18 years old who were sentenced to life without the possibility of parole. (Stats. 2017, ch. 394, §§ 1, 1.5.) As amended, the statute provides: "A person who was convicted of a controlling offense that was committed before the person had attained 18 years of age and for which the sentence is life without the possibility of parole shall be eligible for release on parole by the board during his or her 25th year of incarceration at a youth offender parole hearing, unless previously released or entitled to an earlier parole consideration hearing pursuant to other statutory provisions." (§ 3051, subd. (b)(4).)

We agree with the People that the passage of Senate Bill No. 394 (2017-2018 Reg. Sess.) renders defendant's constitutional claim moot. "'By simply transforming the affected sentences to life with parole terms, [section 3051] avoid[s] the *Miller* issues associated with the earlier sentences.'" (*In re Cook* (2019) 7 Cal.5th 439, 449, quoting *In re Kirchner* (2017) 2 Cal.5th 1040, 1054.) "By affording [juvenile offenders] a meaningful opportunity for release, the Legislature has effectively mooted any claim that imposition of life without parole on a juvenile offender violates the Eighth Amendment." (*People v. Ochoa* (2020) 53 Cal.App.5th 841, 850, citing *People v. Franklin* (2016) 63 Cal.4th 261, 279–280.)

Accordingly, we reject defendant's contention his LWOP sentence violates the Eighth Amendment. (See *People v. Franklin*, *supra*, 63 Cal.4th at p. 268 [enactment of §§ 3051 and 4801 moot constitutional challenge to lengthy mandatory sentence by providing defendant possibility of release after 25 years of imprisonment and requiring Board of Parole Hearings to "'give great weight to the diminished culpability of juveniles

as compared to adults, the hallmark features of youth, and any subsequent growth and increased maturity'"].)

## II. Imposition of Parole Revocation Fine

In their response brief, the People argue the trial court erred by failing to impose a $1,000 parole revocation fine because the fine is mandatory when the sentence, like defendant's, includes a determinate term. They assert defendant's term on count 4, for the attempted robbery of Madera, was two years plus 25 years-to-life on the firearm enhancement. They contend, because the sentence includes a determinate term, the trial court was required to impose a parole revocation fine in the same amount as the restitution fine. They contend the court's failure to impose the required parole revocation fine resulted in an unauthorized sentence that can be corrected on appeal. In his reply brief, defendant agrees with the People's contention.

Because defendant's sentence includes a determinate term, we agree with the parties the court erred in failing to impose a parole revocation fine. As we noted in defendant's previous appeal, our Supreme Court has held even if a defendant is sentenced to LWOP on one count, but he or she is sentenced to a determinate term on another, a parole revocation fine must be imposed. (See *People v. Brasure* (2008) 42 Cal.4th 1037, 1075.) Indeed, the California Supreme Court reiterated *Brasure*'s holding in *People v. Baker* (2021) 10 Cal.5th 1044, 1108–1109, noting there, as here, "'[d]efendant is in no way prejudiced by assessment of the fine, which will become payable only if he actually does begin serving a period of parole and his parole is revoked.'" (*Id*. at p. 1109.)

Section 1202.45, subdivision (a) provides the parole revocation restitution fine should be in the same amount as that imposed for restitution pursuant to subdivision (b) of section 1202.4. And here, the court imposed a $1,000 restitution fine under section 1202.4. Accordingly, the judgment must be modified to include a $1,000 parole revocation fine pursuant to section 1202.45. (See *People v. Terrell* (1999) 69

33.

Cal.App.4th 1246, 1256 [concluding reviewing court may modify judgment to reflect required parole revocation fine, where it was not assessed, in amount identical to restitution fine].)

## DISPOSITION

The judgment is modified to include a $1,000 parole revocation fine under section 1202.45. In all other respects, the judgment is affirmed. The trial court is ordered to prepare an amended abstract of judgment reflecting a parole revocation fine in the amount of $1,000 and to forward a copy of the amended abstract to the Department of Corrections and Rehabilitation.